ASA MITCHELL v. CHARLES G. NAPIER AND ANOTHER.

No matter under what pretence it is cloaked, if the intention was, to receive a greater rate of interest than the law allows for the use of money, it will affect the contract with the taint of usury.

Whether the transaction was so intended, when, upon its face, it does not appear to be usurious, is a question of fact for the decision of the jury.

Where a party is afforded an opportunity of explaining, (by interrogatories propounded to him by the opposite party,) and fails and refuses to do so, the rational and legal presumption is, that a disclosure of the truth would make against him.

This is upon the principle, that the refusal to answer, is deemed a confession of the truth of the alleged fact which the interrogatory is propounded to prove.

APPEAL from Bexar. Tried below before the Hon. Thomas J. Devine. Suit by appellant against Charles G. Napier and Lewis S. Owings, to recover rent alleged to be due upon the following contract, to wit:

State of Texas,    }    Know all men by these presents, that
County of Bexar.    I, Asa Mitchell, of the aforesaid State and county, have this day leased to L. S. Owings and Charles G. Napier, of the aforesaid State, for the consideration of sixty

dollars per month, payable at the expiration of every month, a certain lot of land, situated in the city of San Antonio, State and county aforesaid, on the west side of the San Antonio river, being a part of the lot surveyed by T. Giraud, city surveyor, for Garrett P. Post, on the 14th Nov. 1852, and recorded in the city surveyor's book, page 157 : beginning at the north-east of the west butment of the new bridge, at the water's surface, thence south $87\frac{1}{4}°$ west, $51\frac{3}{4}$ varas ; thence north $13\frac{1}{2}°$ west, 49 varas ; thence north $89\frac{2}{3}°$ east, 40 feet, to the water's edge ; thence down the river, with its meanders, to the beginning. And the said lessees have the privilege of making any improvements upon the said lot, and to have the use and control of said lot for three years, upon the terms above mentioned, from the 1st of October, 1854; and the aforesaid L. S. Owings and Charles G. Napier, or their legal representatives, have the further privilege, at any time during the three years named, of paying for the said lot two thousand dollars: I bind myself, my heirs and legal representatives, to make a good and sufficient title to the above premises, to the said L. S. Owings and Charles G. Napier, or their representatives. It is understood and agreed upon, that the above contract does not include the island opposite the aforesaid lot. It is further agreed upon, that should the said Owings and Napier, decline paying the aforesaid two thousand dollars, at the expiration of three years as above named, the said lot reverts to my possession, together with all the improvements made thereon. In witness whereof, we have subscribed our names, and affixed a scroll for seals, the 1st day of October, 1854.

THOMAS S. ROGERS,        ASA MITCHELL, [L. S.]

CHARLES HUMMELL,        L. S. OWINGS, [L. S.]

                                          C. G. NAPIER, [L. S.]

There was no answer by Owings. The answers of Napier, upon which the case turned, are given in the opinion of the court; and attached thereto were certain interrogatories, propounded by him to appellant, which with the answers thereto, were as follows :

1st. What amount was the defendant, L. S. Owings, in-

debted to you, at the time you purchased of him his horses, carriages, and appurtenances of the livery stable, about the 25th of May, 1855?

Answer. About $1,000, for surety to Willis Hutton, on note of $975; for rent and money loaned about $1,000.

2d. If you state he was indebted to you in any amount, state the several sums, or liabilities, to whom due, when contracted, and on what account?

The second answered in the first.

3d. Did not said Owings convey to you directly, or to another, in trust for you, a large amount of notes, money, credits or property besides, of the value of five thousand dollars, or some such large amount; if yea, state what property was conveyed, of what it consisted, where situated, if conveyed in trust, to whom conveyed, and what was its value?

Answer. He conveyed to me a note on Collins, a blacksmith, for about $200, with a credit of $40 thereon, and some time after, he gave me a deed of trust in my favor, on one hundred acres of land in Karnes county, near Helena, to secure me, as surety for him, to several notes in favor of E. Jones & Co. to the amount of something less than $1000; the value of said one hundred acres, I am not able to state, as there are doubts as to the title.

4th. What consideration was paid by you for the property so conveyed by said Owings? State what amount of money you paid at the time, what amount you had previously advanced, and what amount was intended to secure you against liabilities, as surety of said Owings, and whether nine hundred dollars, or more, of said liabilities, are not still unpaid by you; to whom is the same due?

Answer. As to the amount paid, the bill of sale is on record showing the amount, and is higher testimony than my feeble recollection.

5th. Since you purchased the carriages, horses, harness, &c. of said Owings, have you not advanced him large amounts, or some amounts of money, and were not said advances made

from the proceeds of collections made for said Owings, or from the property which he conveyed to you?

Answer. No; I have not advanced to Owings since the purchase, one dime, nor have I collected one dime for him; and as to collections made from the property conveyed to me, I am not able to state, as I have kept no accounts of my own private sales, not expecting to be called on to give an account of my own private business.

6th. Did not a part of the indebtedness of said Owings to you consist of usurious interest, amounting to from $500 to $1,000, or some such large amount?

Answer. No; I never charged, nor did Owings ever pay me, any interest whatever; and the statement of the defendant Napier, in regard to usurious interest, is false; for it was a contract for rent, as the contract states, and not one word was ever said about interest.

7th. Did not L. S. Owings pay you a large amount of usurious interest, between the 1st of October, 1854, and the answering of these interrogatories? State the amount of usurious interest so paid, and whether the same has not exceeded one thousand dollars.

I have answered the 7th Interrogatory in the 6th answer.

8th. What was the value of the property of every description, and money, conveyed and paid to you, or in trust for you, from the 1st of October, 1854, up to the time of answering these interrogatories, by said Owings? Please annex a schedule or list thereof.

Answer. I am not able to state the value of the property, as it consisted of broken down horses and buggies, some of which have died, some stolen, and some yet on hand. Two of the buggies I gave away; some I have sold on credit, and some yet on hand, and it is impossible for me to make a schedule thereof.

9th. Have you not received from said Owings, since the first of October, 1854, property, money, and obligations, by conveyance directly to yourself, or in trust to another, of the

value of seven thousand dollars or more ? If you answer in the negative, then say whether it was not of the value of six thousand dollars, or more; if not, of the value of five thousand dollars, or more; if not, of the value of four thousand, or more ; if not, of the value of three thousand, or more; if not, of the value of two thousand, or more ?

Answer. No; I have never received from Owings anything but what I have above stated, and what I may be able to realize out of the property received, is yet uncertain ; but one thing I am certain of, that I am worse by the trade made with Owings, and am willing to gather up all the old fixings and deliver them over to any one who will indemnify me in the transaction.

10th. Have not the advances or payments you have made to said Owings, been less than the value of the property you received, irrespective of the usurious interest ? If you say not, you will please add a schedule of the advances so made, and persons to whom, and when.

Answer. I think I have sufficiently answered this interrogatory in my previous answers; and I am not able to render a schedule.

11th. Was it not understood between you and Dr. Owings, when he sold out to you, that, after paying certain debts, the balance of the proceeds of the property was to be paid to him ?

Answer. No; there was no such understanding between us, it was a fair and "bonâ fide" contract, without any intention on my part to defraud any man, and I was drawn into it reluctantly, for the purpose of securing myself, if possible, and I well know now, that I will not succeed in so doing.

The appellant read in evidence the contract sued upon; a transfer by Owings to appellant, in consideration of $2,500, as therein stated, of seven buggies, one barouche, and one sulky, twenty-one horses, and all the saddlery and harness belonging to his livery stable, dated May 28th, 1855; and proved that the appellee, went into possession October 1st, 1854, and remained in possession until the 23d January, 1855, when Napier sold to Owings, who remained in possession until May 28th, 1855.

He also read in evidence a mortgage from Owings to Napier, on the lot described in the contract sued upon, and the note for $3,362 57½, to secure the payment of which it was given; both dated January 23d, 1855, and transferred and endorsed by Napier to J. S. McDonald, and by him to the appellant; a release or conveyance from Owings to appellant, in consideration of $1000, as therein stated, of "all his interest, right, and title, in " and to a rock stable, built by said L. S. Owings and C. G. Napier, "on the west end of the new bridge, in the year 1854," dated August 29th, 1855; the foregoing interrogatories by Napier, and answers thereto by the appellant.

He also proved by a witness, that he heard appellant and Napier talking about the renting of the lot; Napier said, that he and Owings were to pay $60 a month for the lot; witness was now in possession of the lot, and pays appellant $65 per month for the first six months, $75 per month for the next twenty four months, and $85 per month for the next twenty-four months; but rents, in connection with the stable, a frame dwelling house, worth $12 a month, included in the above amount; witness thought the stable could have been built for $3000; Owings and Napier paid $60 for the naked lot; they built the stable while they were paying rent for it. Another witness testified, that he drew the deed from Napier to Owings, and the mortgage from Owings to Napier; Owings assumed to pay the rent to appellant; did not know if Napier paid Owings any money, on account of rent; appellant was not present, and I never heard him say anything about it. Another witness said, "he had heard Mitchell say, he would release Napier, "but Mitchell told Napier he could not release him, because he "had a mortgage upon the property; I think this was in Feb- "ruary, 1853."

The appellee, Napier, read in evidence, a note by appellant and Owings, to Willis Hutton, for $975, dated August 29th, 1855, due thirty days after date.

Appellant moved for a new trial, because the verdict in favor of the appellees was contrary to the law and evidence; and assigned as error, the refusal of the court below to grant it.

*Hewitt* and *Newton*, for appellant. It seems to us, that the only question in the case is, whether the verdict of the jury is sustained or justified by the evidence. In assuming the position that it is not, we are aware of the reluctance with which this court disturbs the verdict of a jury. But when, as we think, the record shows, that there is no evidence to support it, there will be no hesitancy in setting it aside. It is true, that it is necessary for the plaintiff to prove the material allegations of his petition, before he is entitled to recover, if no defence were made. In this we have clearly succeeded. The answer virtually admits the allegations of petition, and would be sufficient for a recovery, were not the obligation avoided by other allegations. But aside from this, the contract is in evidence, which proves itself and the rate to be paid. (See record, p. 36.) It was proved, that defendant went into possession of the lot, under the lease, on the 1st October, 1854, and remained in possession until the 23d day of January, 1855, when defendant, Napier, sold to defendant, Owings, who remained in possession until the 28th May, 1855. (See record, p. 40.) This evidence would entitle the plaintiff to recover for that length of time, say nearly eight months, at $60 per month, unless defendants, under the allegations of the answer, have introduced evidence avoiding the obligation arising upon the state of facts. But is there any such evidence, either in word or inference, in the record? We challenge search. Interrogatories were propounded to plaintiff; he answered them, denying and negativing every proposition assumed by defendants. (See record, p. 26, et seq.) These answers are true, and are corroborated by the bill of sale, mortgage, notes, deeds, &c., read in evidence, in part explaining the transactions between Owings and plaintiff, and all show the falsity of the defences relied upon; and here the case might safely be rested. But we may go farther, and directly negative any and every position assumed by the defendant; and in answer to the plea of usury, take the statement of W. D. Colton, a witness, who said "that he had heard Napier and Mitchell talk about the renting of the lot; Napier said, "he and

Owings were to pay sixty dollars a month for the lot." (See record, p. 47.) Where goes their plea of usury now? Does it not convince any one, that Napier considered he was to pay rent, and not usurious interest? It is his own construction of the contract, and the true one, and he should be bound by it. And more especially is it apparent, when we consider the manner in which he makes this plea.

And as to the plea of release, the same result is attained by an examination of the evidence of W. A. Mitchell and Mr. Schenck, on page 47 of the record; the latter of whom states, that as late as February, 1855, and after the mortgage from Owings to Napier, (record, p. 41 and 42,) "have heard Mit-"chell say he *would* (not that he had or did) release Napier, but "Mitchell told Napier he would not release him, because he had "a mortgage upon the property." There is the negative of the proposition assumed in the plea, and the reason for it. And in the face of all this, can it be said, that there is any evidence avoiding the liability of defendants to pay the rent for the time proven? If not, then the verdict of the jury is against evidence, and contrary to the charge of the court. These defences have been made by Napier alone; Owings does not seem to have had anything to do with them, doubtless, knowing and feeling the justness of plaintiff's claim, and not daring to make so unjust and false an issue. The lot was well situated for their business, and well worth the money agreed to be given for it. No complaint is made of the price of the rent, and defendants should pay their contract.

*I. A.* and *Geo. W. Paschal*, for appellee.

WHEELER, CH. J. The amended answer sets up two grounds of defence; first, that the consideration of the contract sued on was not, as it purports, the rent of a lot, but really was interest reserved at the rate of three per cent. per month upon the price of the lot; and secondly, that the obligation of the contract had been fully satisfied and discharged, by the re-transfer and assign-

ment to the plaintiff, of the lot and improvements, together with a large amount of other property.

If the contract on which the suit is brought is to be regarded as evidencing a sale, or if the parties contemplated a sale, and that was their substantial contract and intention, it would seem incompatible with such contract and intention, that the purchaser should, at the same time, covenant with his vendor, to pay him rent for the property the latter had sold him. It is scarcely to be supposed, that any man should have intended to contract to pay another rent for his own property; or, indeed, that he could make a valid and binding contract to that effect. It would seem to admit of little doubt, that if the parties intended a purchase, they did not intend the payment of rent for the property purchased. If they did not intend a purchase, it is not very reasonable to suppose, they would have gone on and built a rock stable upon the lot worth three or four thousand dollars, under a lease for a term of three years. It is quite immaterial, in what manner or form, or under what pretence it is cloaked, if the intention was, to reserve a greater rate of interest than the law allows for the use of money, it will vitiate the contract with the taint of usury. Whether the transaction was so intended, where upon its face, it does not appear to be usurious, is a question of intention for the decision of the jury. (Andrews v. Pond, 13 Peters, 76, 77; 5 Tex. Rep. 88; 2 Parsons on Cont. ch. 6, § 3, p. 385, et seq. and notes.) Without dwelling to comment upon all the evidence in the case, in view of the transaction as disclosed by it, we think it would be extremely difficult to say, the jury were not warranted by evidence to find the transaction usurious.

But upon the remaining ground of defence; that is, that the indebtedness of the defendant had been satisfied, we think it free from doubt, that the verdict was fully warranted by the evidence. It is in proof, that the plaintiff had procured the transfer back to himself, of the stable erected upon the lot, together with a large amount of other property, of which he is now in the possession and enjoyment. He is charged with not having given any other consideration for it, than the discharge of the defendant's indebtedness; and he is interrogated pointedly

Mitchell v. Napier.

and fully as to the real facts and character of the transaction, and particularly what consideration he paid for this large amount of property; and although he is thus afforded the fullest opportunity to explain, he totally fails and refuses to give any answer to some of the most pointed and material questions propounded, or to give any satisfactory account of the transaction. Where a party is thus afforded the opportunity to explain, and fails or refuses to do so, the rational and legal presumption is, that a disclosure of the truth would make against him; and the jury are warranted in drawing the conclusion, that he cannot, consistently with the truth, answer otherwise than by a confession of the facts, which the questions are propounded to prove by his answers. It is upon this principle, that the refusal to answer is deemed a confession of the truth of the alleged fact, which the interrogatory is propounded to prove. The rule is deduced from the common observation and experience of mankind, that men are ever ready to state all that is favorable to themselves; and that, when a party is interrogated, as to the facts of a transaction, in which he has acted honestly and fairly towards the other party, he will not hesitate to state truly what the real facts of the transaction are. His answers will be full, free, and unreserved; manifesting neither evasiveness, nor the *suppressio veri*. How far the answers of the plaintiff to the interrogatories fall short of this test of truth and honesty, it is unnecessary to observe. They speak for themselves too plainly to require comment. Read in reference to the defendants' answer to the action; the very distinct, explicit, particular, and unmistakeable questions put to the plaintiff, about matters of which it was impossible to suppose he was ignorant; and the other evidence in the case; they leave little doubt, as to the motive which prevented a full, and free disclosure of the facts sought to be elicited from the party. Considered with the other evidence in the case; we see no cause to hesitate in coming to the conclusion, that the verdict of the jury has attained the very truth and justice of the case; we think it warranted by the evidence, an d are therefore of opinion that the judgment be affirmed.

9                                        Judgment affirmed.