## THE INTERNATIONAL BUILDING AND LOAN ASSOCIATION
### v. CHARLES BIERING.

#### No. 102.

**1. Building and Loan Associations—Usury—Premium.**

The building association having money to loan, exacted a premium from the borrower. The premium and the interest stipulated exceeded 12 per cent per annum on the money loaned. *Held*, that the *premium* was a device to conceal usury; it was so much money to be paid in addition to the specified rate, for the use of the money borrowed.......... 480

**2. Usury—Payment of Interest on Usurious Contract.**

The law is, that each payment made upon a contract affected with usury is a payment upon the principal, applied by the law, notwithstanding it was received and paid as interest ................................ 480

##### ON MOTION FOR REHEARING.

**3. Pleading—Items of Defense.**

An answer setting up items in offset of the plaintiff's claim is only a basis of defense as to the items so pleaded ........................... 483

**4. Premium—Privilege of Borrowing.**

The privilege of borrowing is nothing more or less than the right to use the money. It can not cover usury in the amount paid for the loan .. 484

ERROR to Court of Civil Appeals for Fourth District, in an appeal from Bexar County.

The by-laws of the building and loan association, so far as involved in this case, are given in the case of Abbott v. Building and Loan Association, supra. Other facts are given in the opinion.

*B. L. Aycock*, for plaintiff in error.— 1. The court erred in his conclusion that the contract exacted a greater rate of interest than allowed by law. Rev. Stats., arts. 2972, 2974, 2978; Tyler on Usury, 98; Reese v. Building Assn., 19 S. W. Rep., 918, and authorities; Building Assn. v. Abbott, 85 Texas, 220.

2. There was no usury in the first contract; and if there was, it was purged by the second contract. Building Assn. v. Abbott, 85 Texas, 220; Hensel v. Building Assn., 85 Texas, 215; Building Assn. v. Lane, 81 Texas, 369.

*Upson & Bergstrom*, for defendant in error.— 1. All sums of money paid or agreed to be paid to the lender for the use of money loaned, whether denominated interest, premium, or otherwise, when amounting to more than 12 per cent per annum on the sum of money actually loaned, is usurious, and the lender under such contract forfeits all right to demand or collect any interest on such contract; and so long as any portion of the original principal remains unpaid, and the lender attempts to collect the same, the premiums paid on account of the usurious interest on such loan should be credited on the principal. Cassidy v. Jackson, 68 Texas, 287; Building Assn. v. Lane, 81 Texas, 369; Building Assn. v. Robinson, 78 Texas, 163; Building Assn. v. Abbott, 85 Texas, 220.

2. All contracts made as a supplement to or arising out of a prior usurious contract are tainted with usury, unless all usurious interest has been deducted and allowed in the settlement thereof.

BROWN, ASSOCIATE JUSTICE. — In September, 1884, Charles Biering became the owner of seven shares, third series, of the stock of the defendant, International Building and Loan Association, and on March 1, 1885, he borrowed from the association the sum of $700, for which he executed the following note:

" $1400.                    SAN ANTONIO, TEXAS, March 1, 1885.

" On or before the maturity of the third series of the stock of the International Building and Loan Association, I promise to pay to the order of the International Building and Loan Association, at its principal office in San Antonio, Texas, the sum of $1400, with interest at the rate of 6 per cent per annum from the date hereof until paid; also, the further sum of $14 per month from this date until maturity of the aforesaid series of

stock, as provided for in the by-laws of said association, which by-laws are made and to be taken as a part hereof.''

Biering paid the interest on the note until May 1, 1886, amounting to the sum of $189, and paid the monthly installments on the stock to said date.

On the 26th day of May, 1886, the parties entered into a new arrangement, and Biering executed and delivered the following instrument:

"*State of Texas, County of Bexar.*—Whereas, heretofore I borrowed from the International Building and Loan Association a sum of money and executed an instrument in writing therefor, giving a lien on real property to secure the payment of said money, all of which will more fully appear by reference to said instrument, which is of record in said Bexar County, and the obligations therein appearing to be burdensome to me, and I having applied to the directory of said association for relief, and the same being granted, this instrument witnesseth, that in consideration of the said association cancelling and forgiving a portion of said debt and lowering the interest and premium that I then agreed to pay and have heretofore paid, and the said association granting to me a less rate of dues and interest to be by me heretofore paid monthly; this is therefore a reaffirmance of said recorded instrument, and of the debt therein cited, together with all the stipulations in it contained, except as to the amount of said debt, which is hereafter to be $1250 instead of the amount in said instrument mentioned, and that monthly payments for dues and interest are to be reduced and are hereafter to be $12.75 per month. And I hereby relinquish to said association one-half shares of stock by me owned, and the same are by my authority cancelled and made void. And this is to be a complete accord and satisfaction between myself and said association of any and all claims whatsoever not herein before specially provided for.

"In witness whereof, I hereto sign my name, on this 26th day of May, 1886.

"Witness:                              "Charles W. Biering.

"William Schultz,

"M. Linder.''

Under this supplemental contract Biering paid the interest and the installments on stock as therein specified until about July, 1892, when he refused to pay further, and tendered to the association the sum of $204.75 as balance on the note for $700, which is the exact difference between the principal of the note and the whole amount of interest paid thereon, he claiming that the contract was for usurious interest and void as to all interest.

Under the by-laws of the association any stockholder had the right to withdraw the amount of money paid in by him, with such interest and

profits as the directors might allow. Biering gave the notice required by law, and on the 11th day of July, 1892, demanded the surrender value of his stock, which according to the by-laws he was entitled to receive in thirty days from that date. The court found the value of the stock to be $646.75.

The trustee, William Holland, advertised the land embraced in the deed of trust for sale, and Biering applied for and was granted a writ of injunction to restrain the sale. Defendant association answered, setting up the making of the two contracts and the execution of the deed of trust by Biering, and prayed for a foreclosure upon the property, and that the same be sold under order of the court.

Upon trial the court gave judgment in favor of Biering against both defendants, perpetuating the injunction, and against the defendant International Building and Loan Association for the sum of $448.75; from which judgment appeal was·taken by the association, and the judgment was reversed by the Court of Civil Appeals and rendered in favor of defendant association against Biering for $218, foreclosing lien upon the lot, perpetuating injunction as to any indebtedness of appellee to the association other than that adjudged, and cancelling the stock of Biering.

The by-laws of the association provided that each stockholder should pay monthly $1 on each share of stock until it should be of the value of $200 per share, when the stock must be surrendered and cancelled, at which time the association would pay to such stockholder $200 for each share so maturing.

When a stockholder borrowed money he was required to deliver his stock as security, and to pay on the stock regularly until it matured, at which time the debt became due and the stock was cancelled and the debt paid.

When the association had money to lend it was put up at the highest bidder; that is, bids were made of a premium to be paid for the *privilege* of *borrowing* the money, which premium in this case was $700, and was added into the note, making the sum to be paid $1400.

This case is very similar to Abbott v. International Building and Loan Association, decided by this court at the present term [ante, page 467], but not so identical as to be disposed of by one opinion.

Counsel for defendant in error do not deny that the contract as originally made was usurious, but assert that the supplemental contract cured this vice in the original note. Was the note, after the supplemental contract, usurious, is the question for our determination.

The note was to mature with the stock, and would therefore be due whenever the stock should be of the value of $200 per share. There could under the by-laws be no loss on this stock, so far as it affected the stockholder, because the association was bound to pay to him upon demand a sum equal to the amount he had paid in on the stock. If no profits ac-

crued, the payment of $1 per month for 200 months would make the stock worth $200 per share, and it follows that the note must fall due at a date not later than 200 months from the 1st of October, 1884, the time when the shares were issued. When the supplemental contract was made twenty-six months and twenty-five days of the time had elapsed, and there remained 174 months and five days to the time when the original note would mature.

The premium was a device to conceal usury. It was so much money to be paid, in addition to the specified rate of interest, for the use of the money borrowed. If the premium added to the interest amounted to more than 12 per cent per annum, the contract was usurious. Cassidy v. Jackson, 68 Texas, 287; Building Assn. v. Lane, 81 Texas, 369. The premium to be paid at the end of 200 months was $550. This was at the rate of $2.75 per month or $33 per annum, which, added to the interest to be paid at $6.25 per month, $75 per annum, would amount to the sum of $108 for the use of $700 for one year—a rate of more than 15 per cent per annum.

It is not necessary for us to decide what effect inserting the sum of $14, payable monthly, contrary to the by-laws and unexplained, would have upon the question of usury, as we hold the transaction to be usurious independent of that stipulation.

If the stockholder who borrowed money from the association should desire to pay the debt and redeem the stock, he could do so by paying one-eighth of the premium for each year that he had the use of the money. If we consider the supplemental contract under this provision, it is unquestionably usurious. To illustrate: Suppose the borrower at the end of five years concluded to pay off the debt and redeem the stock; he must pay the debt ($700), on which he would have paid $375 interest, and in addition he must pay one-eighth of the premium for the whole five years, that is $343.75, aggregating the sum of $718.75 paid for the use of the money. The rate per annum would be a fraction over 20 per cent.

The Court of Civil Appeals held, that as Biering had not actually paid interest at a rate greater than 12 per cent, he could not receive credit for the sum paid as interest upon the usurious contract. The law is, that each payment made upon a contract affected with usury is a payment upon the principal, applied by the law, notwithstanding it was paid and received as payment of interest. This is not a question of recovering back usurious interest paid, but it is the application of the payment of such interest to the principal of the debt. The contract being usurious, the $189 paid as interest before the making of the supplemental contract was in law a payment upon the principal of the debt, and the supplemental contract not having purged the original note of usury, the release of that credit was of no avail to the association; there was no valid consideration to support it. Building Assn. v. Lane, 81 Texas, 369.

The District Court gave credit upon the principal of the note for all money paid as interest, and settled the remainder of the note by applying so much of the sum due from the association to Biering for the stock, the value of which he was entitled to withdraw, and giving judgment for plaintiff for the remainder.

The judgment of the Court of Civil Appeals is reversed and the judgment of the District Court is affirmed.

*Judgment of District Court affirmed.*

Delivered March 12, 1894.

### ON MOTION FOR REHEARING.

*B. L. Aycock,* on motion for rehearing. — It is respectfully submitted that the court is in error in treating the premium bid for the preference money under the charter and by-laws of the association as a burden for the use of the money.

The plaintiff in error became a member by buying these shares in September, 1884. His status from then till March, 1885, was as shareholder with shares unpledged.

He, under the charter and by-laws of the corporation, disposed of his shares, anticipating their ultimate value of $200 each when matured; engaged to pay the dues and 6 per cent interest on the amount of the note, exactly double the amount of actual cash received, until they matured, and was to receive at the maturity his mortgage cancelled and satisfied without paying more. The $700 called premium in the note was never to be paid. He as a shareholder had the obligation of the society that legal interest was all that he was ever to pay, let the shares mature sooner or later.

In Lyons-Thomas Hardware Company v. Perry Stove Manufacturing Company [ante, 143], Chief Justice Stayton says: "The memorandum of association termed by the statute the 'charter' is required to state the purpose for which it is formed. Rev. Stats., art. 587. This requirement is not solely that evidence may be furnished that the company is one intending to pursue a business for which the statute permits incorporation, but is also intended for the protection of those who may become stockholders or creditors; * * * without this they can not know the extent of its powers nor the hazards to which they might be exposed. * * * The statute further provides that private corporations must have power to enter into any obligation or contract essential to the transaction of its authorized business. Rev. Stats., art. 575."

The "memorandum" or "charter" in the incorporation of defendant in error, set forth in the judge's findings, is: "To purchase and sell real estate in the city of San Antonio and Bexar County, and to improve the

# 482

same; to lend money on real estate security in said city and county, on the stock of the members of this corporation, and principally to aid and assist its members in acquiring, improving, and holding real estate in said city and county, and particularly to aid and assist its members in acquiring homesteads for themselves and their families.''

Article 6 of the charter provides, that at each of the stated meetings the money in the treasury shall be loaned in open meeting at a rate of interest not to exceed 8 per cent per annum, and the stockholder who shall bid the highest premium to be fixed in the by-laws for the preference of the priority of loan shall be entitled to receive a loan not to exceed in amount the sum of $200 per share of stock held by such borrowing stockholder.

Revised Statutes, article 575, subdivision 6, grants powers '' to make by-laws not inconsistent with existing laws for the management of its property, the regulation of its affairs, and the transfer of its stock.''

Subdivision 7: '' To enter into any obligation or contract essential to transaction of its authorized business.''

The method of business is to advance a member the present value of the shares, that he may build a house for his family which shall not cost him more than ordinary rent; and when the shares shall mature to the face or par value by the profits of reloaning the money monthly, compounding it by this co-operative method, the member disposes of his stock, all of his fellow members co-operating in this way, is not a burden for the use of the money actually received; the burden is on his fellow members whose joint co-operative payments of lawful interest is a collateral source from which the money comes to liquidate the premium. This is not a partnership, but a co-operative undertaking to jointly acquire homes. Each series of stockholders is independent. Why should not the owners of a series of stock compete with each other for the priority of taking the first money coming into the treasury? It is a regulation amongst themselves, and a method of operation '' essential to the transaction of its authorized business.'' To take away this right is to annul the charter indirectly, without allegation or proof. There was no pleading attacking the charter in the particular above explained. No notice has ever been served on us to meet an issue that the provision of the charter authorizing competitive bidding for privileges '' is a disguise '' to evade the usury law. We should have been apprised of this charge, and had a day in court. A mere surmise that the premium bid for priority of right to the loan is insufficient to establish usury. This method of selecting its borrowers was authorized by its charter, and if plaintiff in error relied on that to establish usury—it being on its face valid and authorized by statute—it should have been attacked by pleadings as the vice in the contract.

BROWN, ASSOCIATE JUSTICE.—The International Building and Loan Association asks for a rehearing in this cause for several reasons, which we will briefly examine.

First. It is claimed that the court below entered judgment against it for more than plaintiff claimed in his petition. Biering alleged in his petition, among other things, that he had paid on his seven shares of stock a given amount, and had given the notice of withdrawal required by the by-laws; that the directors of the defendant had failed to ascertain the withdrawal value of his stock to which he was entitled, and that under the by-laws he was in any event entitled to the full amount he had paid, for which he prayed judgment, and for general relief.

Defendant answered, setting up its by-laws, from which the right of plaintiff to withdraw and the terms upon which such withdrawal could be made appeared. In a trial amendment defendant set up that it had under the by-laws ascertained the value of the series of stock in which plaintiff owned the seven shares to be $99.50 per share; that plaintiff was owner of six and one-half shares of that series, and asked that in case plaintiff was entitled to recover, the ascertained value of his stock be credited upon the debt due to defendant, which was alleged to be $1260. It also alleged, that after deducting the value of the stock, defendant was entitled to judgment for $613. To subtract the amount claimed as balance on the debt from the amount of the debt gives the admitted value of the stock at $647. The court found the value to be $646.75. The defendant having pleaded the act of the directors in declaring the value, and the maturity of the stock and its ascertained value, the court rightly entered judgment upon the answer. Bourks v. Vanderlip, 22 Texas, 221.

It is likewise claimed that the defendant association was entitled to a credit for the installments which plaintiff failed to pay upon the stock. Nowhere in the answer does it appear that any unpaid installments upon stock were claimed against plaintiff. On the contrary, the several items are specifically stated, and do not include such claim; besides, the court found that plaintiff had paid all the installments accruing before the time that the stock was declared matured. By the terms of the by-laws, when the stock was matured it was to be cancelled, and plaintiff was entitled to the value of the stock, less any indebtedness due from the shareholder to the association. Certainly after plaintiff was entitled to withdraw the money and the stock was cancelled, he could not be required to pay upon it.

Second. It is urged that the premium embraced in the note was not to be paid for the use of the money loaned, but that the "method of business is to advance a member the present value of the shares, that he may build a house for his family, which shall not cost him more than the ordinary rent." The same contention was made in Jackson v. Cassidy, 68 Texas, 283. Chief Justice Willie, for the court, so clearly exposed the

fallacy of the proposition that it is only necessary to quote from that opinion to show its want of plausibility. The court said: "In the ordinary affairs of life money advanced upon securities with the understanding that both the principal and interest may be collected by realizing upon the securities, is considered a loan. A debt is created; otherwise the party advancing the money has no right to recover principal together with interest on the amount advanced. Having the full effect of a loan, it must be so considered with reference to our usury laws, otherwise the features of the transaction which give it a different appearance would furnish a device by which these laws might be evaded altogether."

In Mitchell v. Napier, 22 Texas, 120, the court said, with reference to the evasion of the usury law: "It is quite immaterial in what manner or form, or under what pretense it is cloaked, if the intention was to reserve a greater rate of interest than the law allows for the use of money, it will vitiate the contract with the taint of usury."

It needs no argument to apply these principles to the facts of this case. It is not claimed that the $700 was not loaned to Biering, which he was to repay with interest. This transaction was nothing but a loan, by which a price was to be paid in addition to the interest expressed for the use of the money.

Biering derived no advantage from the transaction except the use of the money borrowed, and he agreed to pay in addition to that sum and interest the sum of $560. What was the $560 to be paid for? It is urged that the premium was paid for the *privilege* of *borrowing*. The privilege of borrowing is nothing more nor less than the right to use the money. The highest bidder at an auction sale has the privilege to own the property sold, but the consideration of the price paid is the ownership of property. It is quite too clear for argument that the plan adopted was but a device by which it was attempted to secure for the use of money loaned a price greater than that allowed by law, and no disguise will be sufficient to hide this purpose from the investigation of courts under the plain rules established for their government.

Counsel ask the question, "Why should not the owners of a series of stock compete with each other for the priority of taking the first money coming into the treasury?" The answer is, that when it assumes the form of a cloak for usury, it is forbidden by law. The motive of the lender and the purposes of the borrower are not matters for consideration by courts.

Third. It is claimed that the pleadings were not sufficient to justify the court in holding that the agreement to release the credit to which Biering was entitled on account of usurious interest paid was void. Plaintiff, in his supplemental petition, charged that the supplemental contract was usurious, and therefore that it could not have the effect to cure the vice of the first. Defendant set up the supplemental contract, which upon its

face showed that it was tainted with usury, and under the decision in Building Association v. Lane, 81 Texas, 369, it could have no effect on the transaction.    What appeared from defendant's pleading need not be alleged by the plaintiff.

Fourth.   Objection is made to that part of the opinion of this court which refers to the article of the by-laws allowing a borrower to redeem his stock by paying the money borrowed and one-eighth part of the premium for each year that he had the use of the money.    An examination of the opinion will show that it does not rest upon that proposition, but merely states that if that rule is to govern the contract is usurious.

The motion for rehearing is overruled.

Delivered April 9, 1894.