## COTTON v. COOPER. (No. 29–2666.)

(Commission of Appeals of Texas, Section A. Feb. 19, 1919.)

1. USURY ☞16, 78—CONTRACTS—"USURIOUS CONTRACTS."

A contract, by which defendant, under the guise of purchase of wages to be earned by the borrower in the future, charged 30 per centum a month interest for a loan, is usurious, under Const. art. 16, § 1, fixing the maximum rate of interest at 10 per centum, and under Rev. St. 1911, art. 4980, is void as to the interest.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Usurious.]

2. USURY ☞100 (1)—USURIOUS CONTRACTS—INTEREST.

Where a contract was usurious, amounts paid as interest are by law applied to the principal sum due.

3. MASTER AND SERVANT ☞341—MALICIOUS PROCUREMENT OF DISCHARGE—EVIDENCE.

Where defendant, under the guise of buying wages to be earned, charged 30 per centum per month for a loan, and, though plaintiff had paid in as interest, which by law was applied to payment of the principal more than enough to discharge the loan, filed an assignment with plaintiff's employer, knowing the employer's rule to discharge in such cases, held, that the question whether defendant wrongfully caused plaintiff's discharge was for the jury.

4. APPEAL AND ERROR ☞1094(1)—REVIEW —COURT OF CIVIL APPEALS.

Excessiveness of verdict is ordinarily a question of fact, and the determination of the Court of Civil Appeals is final.

5. DAMAGES ☞94—PUNITIVE DAMAGES.

The imposition of heavy exemplary damages, where the actual damages recoverable were small, is a fact which ought to be looked to to determine whether passion rather than reason dictated the verdict.

6. DAMAGES ☞87(1) — "EXEMPLARY DAMAGES"—"PUNITIVE DAMAGES"—NATURE OF.

Exemplary or punitive damages are awarded in the nature of a punishment, not to enrich the injured party, but for public good.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Exemplary Damages; Punitive Damages.]

7. MASTER AND SERVANT ☞341—EXEMPLARY DAMAGES—AWARD.

An award of $400 actual damages and $3,500 exemplary damages in favor of an employé whose discharge had been brought about by a loan broker, who, after being paid more than the principal of his loan, filed an assignment of wages executed by the employer, thus causing the latter's discharge, held warranted, and not to have been dictated by passion or prejudice.

Error to Court of Civil Appeals of Fourth Supreme Judicial District.

Action by Will Cooper against Almon Cotton and another. Judgment for plaintiff was affirmed by the Court of Civil Appeals on appeal of the named defendant (160 S. W. 597), and said defendant brings error. Affirmed.

J. V. Meek, of Houston, and Terrell, Walthall & Terrell, of San Antonio, for plaintiff in error.

Barkley & Green and A. N. Denton, all of Houston, for defendant in error.

SONFIELD, P. J. Suit by Will Cooper, plaintiff, against Almon Cotton and G. E. Cotton, defendants, to recover actual damages in the sum of $700, alleged to have been suffered by plaintiff by reason of his discharge from the service of the railroad company through the wrongful, fraudulent, and malicious conduct of defendants and their agents, and for $5,000 exemplary damages.

Plaintiff alleged that the defendants, falsely claiming that he was indebted to them in the sum of $35, filed with the Houston & Texas Central Railway Company, his employers, copies of two written instruments, purporting to be assignments made by the plaintiff of portions of his salary or wages to Almon Cotton; that at the time the said assignments were filed by the defendants the said railway company had in force a custom or rule, to the effect that any employé known to have given an assignment or any part of his salary or wages should at once be discharged from its service; that, although the defendants were aware of such rule at the time, and were also aware that at such time he was not indebted to them in any sum, they nevertheless wrongfully, willfully, and maliciously, with wanton disregard of the rights of the plaintiff, and for the purpose of procuring his discharge, filed copies of said assignments, together with notice thereof with the said railway company, and because of the acts of defendants complained of he was discharged by the said railway company from their service, and his wages then due were withheld from him. Trial in the district court before a jury resulted in a verdict and judgment for plaintiff against Almon Cotton for $400 actual damages, and $3,500 exemplary damages.

On appeal the Court of Civil Appeals affirmed the judgment of the district court. 160 S. W. 597.

The following is in part a statement of the facts by the Court of Civil Appeals:

"Almon Cotton is father of G. E. Cotton. G. E. Cotton is 28 years old; * * * he is married and has four children. Almon Cotton owns and operates what he calls 'loan offices' in many of the Southern states, in Louisiana, Mississippi, Alabama, Florida, Arkansas, and Texas, apparently only where ignorant negro labor is abundant. In some cities he conducted several of these agencies or loan offices, always under high-sounding names, such as the 'Dixie Loan Com-

pany,' or some name concealing his own identity and calculated to give to the public the impression of a corporation. In Houston, Tex., he operated the Texas Loan Company, the Empire Loan Company, the New York Loan Company, and the Eagle Loan Company. His business was to loan money on chattels and to 'buy' salaries or wages. And this was his method: His own office, called 'Central Office,' was in one of the large office buildings of the city of Houston. His various loan companies were scattered about town. In general charge of the loan offices he had one L. H. Joyner, who was his general agent and manager, vested with full authority to act at all times. He also had 'outside men' whose duty it was, among others, to advise the needy and helpless that they could always get money from one of Cotton's institutions. The interest charged upon loans seems uniformly to be 20 per cent. per month to whites and 30 per cent. per month to negroes. Each office had positive orders not to make a 'loan' upon salaries or wages, but, instead, to 'buy' salaries and wages or any such part thereof as the customer should desire to sell and to take an assignment of such an amount thereof as should be 'bought' together with power of attorney to Almon Cotton to collect from the borrower's employer. The advances were made in this manner: The borrower executed his assignment and power of attorney, we will say for $19.50, and was thereupon given $15 in cash. At the end of the month he was 'permitted' to collect his own salary and bring in the portion which he had pledged to the loan office. If he desired to retain the money he had borrowed, he did not pay the 30 per cent. interest and renew the obligation. Instead, he went through the formality of paying $19.50 in cash. He then executed a new obligation and assignment and received back $15 of the money paid by him. * * *

"Appellee, Cooper, in December, 1909, negotiated with appellants' office, known as the Texas Loan Company, what he thought was a loan of $10 on his salary. The contract he signed was for $13, which, instead of being in form of a loan, was written so that it appeared that he had 'sold' that portion of his salary to accrue the succeeding month and also made a power of attorney for the collection of the amount by Cotton. Cooper was a negro brakeman or yardman in the service of the Houston & Texas Central Railway Company, earning about $115 per month. He could not read or write, and the paper which he signed was never read to him. Monthly thereafter, with perhaps a few exceptions, he renewed his loan in the manner above described, up to the time of beginning litigation with appellant. The amount was increased or was made less in accordance with his needs; it appearing that at least once he was entirely out of debt to Cotton. He also had some dealings with another of Cotton's loan offices. The method of doing business was always the same and the rate of interest was always the same. In August of 1911, litigation was begun between appellee and appellant in the courts of Harris county involving the transactions above mentioned. On January 2, 1912, Almon Cotton transferred all his loan business in Texas to G. E. Cotton, his son. The terms of that assignment, briefly stated, were: The consideration was $300,000, all on credit. G.

E. Cotton executed his note for that sum to Almon Cotton, due on or before two years after date, and bearing 8 per cent. interest. In case the note should not be paid at maturity, G. E. Cotton agreed to convey the business to any one named by Almon Cotton and at the price fixed by him. And it was also agreed that all the moneys collected by G. E. Cotton, whether principal or interest, except necessary operating expenses and a salary of $100 per month to be retained by him for his services, should be 'turned over to Almon Cotton or placed in the Commercial National Bank of Houston, Tex., to his credit.' He agreed to apply such money first to payment of interest and next to discharge of the principal. Almon Cotton was a man of large means, while G. E. Cotton was then insolvent and wholly execution proof. No effort was made to show that the business, purported to have been sold to G. E. Cotton, was worth $300,000 or any other sum. At this time the litigation filed by Cooper against Almon Cotton was pending. On January 8, 1912, L. H. Joyner, who claimed he was acting under the advice of J. V. Meek, attorney for Almon Cotton, wrote upon the back of the two salary assignments referred to an indorsement, 'Without recourse,' to G. E. Cotton, which was then signed Almon Cotton. Joyner then filed copies of said assignments with the Houston & Texas Central Railway Company, accompanied by a letter asserting that appellee was then indebted to G. E. Cotton, assignee of Almon Cotton, in the sum of $35 upon those assignments. The railway company at once discharged Cooper and retained funds due to him in the sum of $99.60 to satisfy the appellants' assignments."

The pleadings and evidence raised the issue as to the true character of the two instruments of date, the 16th day of January, 1912, and whether the transactions evidenced thereby were independent or a continuation of a contract theretofore existing between the parties. These issues were properly submitted to the jury and the verdict involved the findings that the transactions were a continuation of the prior contract and were loans made to plaintiff by defendant under the guise of assignments or sales of wages to cloak usury. The verdict involved the further findings that the payments by plaintiff to defendant as interest were sufficient to pay the principal sum, with interest at the rate of 10 per cent. per annum, and that the purported sale by defendant to G. E. Cotton of his Texas business, including a transfer of the contract or obligation of plaintiff, was simulated, not intended to, and did not vest title in the said G. E. Cotton.

[1] Section II, art. 16, of the Constitution provides:

"All contracts for a greater rate of interest than 10 per centum per annum shall be deemed usurious."

Article 4980, Rev. St. 1911, reads as follows:

"All written contracts whatsoever, which may in any way, directly or indirectly, violate the preceding article by stipulating for a greater

rate of interest than ten per cent. per annum shall be void and of no effect for the amount or value of the interest only; but the principal sum of money or value of the contract may be received and recovered."

[2] The contract herein was usurious, and under the above statute was void as to the interest. The amounts paid by plaintiff as interest were by the law applied to the principal sum due. The rule is thus stated in Loan Association v. Biering, 86 Tex. 476, 25 S. W. 622:

"The law is, that each payment made upon a contract affected with usury is a payment upon the principal, applied by the law, notwithstanding it was paid and received as payment of interest. This is not a question of recovering back usurious interest paid, but it is the application of the payment of such interest to the principal of the debt."

The jury having found that the amount paid by plaintiff, as interest, was sufficient to pay the principal sum due, together with interest, it follows that at the time of the filing of the instruments with the railroad company and the notice to the company of the assignment of wages by plaintiff, the indebtedness had been fully paid, and defendant was without warrant in the filing and the giving of such notice. Rosetti v. Lozano, 96 Tex. 57, 70 S. W. 204, is cited and relied upon by defendant as authority for the proposition that the above rule, announced in Loan Association v. Biering, supra, no longer prevails in Texas. It is true, as stated by defendant, in that case it was held that in order to a recovery of the penalty for usury, provided in article 4982, Rev. St. 1911, a direct action, either by an original proceeding or cross-action, is necessary. This is not a suit for the recovery of interest paid under a usurious contract, or for the penalty for usury. The question of pleading and procedure in such cases does not therefore arise. Plaintiff asserts that the amounts paid by him as interest under the usurious contract are, by the law, applied to the payment of the principal. Rosetti v. Lozano, supra, in no manner questions or overrules the doctrine so announced in Loan Association v. Biering, supra.

[3] Defendant complains of the action of the trial court in submitting to the jury the question whether the discharge of plaintiff by the railroad company was the result of the execution of the instruments by plaintiff, or their filing with the railroad company by defendant or under his direction, contending that it should be held, as a matter of law, that the execution of the instruments was the cause of plaintiff's discharge from the service.

The railroad company had promulgated the following rule:

"Assignments of wages by power of attorney, or otherwise, is prohibited and will cause discharge; employés are expected to pay their just debts."

Of this rule plaintiff had knowledge. The evidence discloses that defendant had for years held numerous instruments of like character, executed by railroad employés, the great majority not having been filed with the railroad company, and there is no evidence of discharges by the railroad company of employés who merely executed the instruments. There is evidence also that it was not in every case that a discharge resulted from the filing of such instruments; that the rule was not always enforced. One of the general attorneys of the railroad company testified that it was not the execution of a power of attorney that caused the discharge, for the railroad company would not know about it; "but when such employé is unable or unwilling to pay, and they cannot wring any more money out of him, if they turn this power of attorney in to the pay department, it is sent to the operating department and the man loses his position." The existence of such rule not uniformly enforced, but often disregarded, would not be conclusive, and the question whether the discharge was the result of the execution or of the filing of the instruments was for the jury.

Had plaintiff, in fact, assigned or sold wages to defendant, or had plaintiff been indebted to him at the time of the filing of the instruments evidencing such indebtedness, defendant would have been within his right in the filing, the instruments so authorizing him. If under such circumstances, as a result of the filing, plaintiff had been discharged from the service of the company, no liability would attach to defendant. In such case he would be exercising a contract right and the motives actuating him would be wholly immaterial; but at the time of the filing, plaintiff's indebtedness to defendant had been fully paid and discharged. Defendant was charged with knowledge that the amounts paid him by plaintiff as interest was by the law applied to the principal. He had knowledge then that nothing was due him from plaintiff, and the authority in the instruments to collect was no longer of any force or effect, and did not authorize the filing. Defendant cannot be heard to say that usury is a matter of defense or offset and could be waived; that, therefore, he could not be charged with knowledge that plaintiff would insist upon usury as a defense or as an offset. The record discloses that prior to the filing of the instruments, plaintiff brought suit against the defendant in a justice court of Harris county for the recovery of usurious interest, the penalty, and for the cancellation of the instruments evidencing the indebtedness. Judgment was rendered in favor of plaintiff. The suit pertained to the very transactions involved herein, and the instruments sought to be canceled by the judgment were those thereafter filed. In that suit the amount paid as interest which plaintiff insisted should be applied to the principal was

in evidence. An appeal was taken by defendant from this judgment to the county court of Harris county, and pending this appeal the instruments were filed. By this suit defendant was notified, if notice was necessary, that there was no waiver by plaintiff of his right to have the amounts paid, as interest, applied to the principal, thereby fully discharging all the indebtedness.

The pleadings and evidence sufficiently raised the issue of the recovery of exemplary damages, and the court fully and correctly instructed the jury with reference thereto.

Writ of error was granted herein, because the court inclined to the opinion that the amount of exemplary damages awarded plaintiff was so disproportionate to the actual damages allowed, that the verdict should not be permitted to stand.

[4] Excessiveness of a verdict is ordinarily a question of fact, and the determination by the Court of Civil Appeals is final. Railway Co. v. Goswick, 98 Tex. 477, 85 S. W. 785; Wilson v. Freeman, 108 Tex. 121, 185 S. W. 993, Ann. Cas. 1918D, 1203.

The view taken by the Supreme Court appears to be that the question here is not as to an excessive verdict. Exemplary damages, being awarded only where actual damages are found, must bear proportion to the actual damages sustained, and whether or not so proportionate is a question of law.

[5] In the view we take of the verdict after a careful examination of the record, we do not deem it necessary to discuss this question.

In Tynberg v. Cohen, 76 Tex. 416, 13 S. W. 316, the court says:

"It has been said in some cases that exemplary damages should not be disproportioned to actual damages; but it was not meant by this that the one should be in any exact or approximate ratio to the other. All that was meant was that the imposition of heavy exemplary damages, where the actual damages recoverable were small, was a fact which ought to be looked to to determine whether passion rather than reason dictated the verdict."

[6, 7] Exemplary damages are in the nature of a punishment. They are not awarded to enrich the injured party, but are intended rather for the public good. Such damages are recoverable only when there are present elements of aggravation or oppression; where there is malicious, willful, wanton, or reckless disregard and invasion of the rights of another. They are intended as a warning and an example to prevent the defendant and others from the commission of like offenses and wrongs. Punitive in character and awarded for the public good, their proportion or ratio to the amount of actual damages recovered must depend upon the state of facts in any given case. The court in Tynberg v. Cohen, supra, declares it the duty of the court "to carefully determine whether justice between the parties or the welfare of society demands the imposition of such a punishment."

To the facts hereinabove set out, a part of the statement of the facts by the Court of Civil Appeals, might be added others from the record revealing the nefarious character of the business of the "loan offices." We will not particularize or set out such additional facts. The record discloses that the "loan offices" controlled by defendant are conducted in utter disregard of private rights and the public good, and that the system has fastened itself upon many hundred employés of various industries. In the city of Houston alone between 1,000 and 1,500 railroad employés are on defendant's books. In the great majority of instances the borrowers are from the very ignorant class. Usurious transactions of the most extreme and aggravating type are cloaked and concealed by subterfuge in order to evade the penalties of the law. The powers of attorney executed by those dealing with defendant are as chains binding them to the system. The threat of the filing of these instruments and the consequent loss of employment is kept ever before them, driving them through fear into deeper slavery. In a word, the business is fraught with great evil, not only to the individual, but to the public as well.

While the amount of exemplary damages awarded plaintiff seems disproportionate to the amount of actual damages allowed, in the light of the record, we believe the award fully warranted. In view of the peculiar and exceptional facts of the case, we conclude that reason, not passion, dictated the verdict, and "the welfare of society demands the imposition of such a punishment."

We are of opinion that the judgment of the Court of Civil Appeals, affirming the judgment of the district court, should be affirmed.

PHILLIPS, C. J. The judgment as recommended by the Commission of Appeals is adopted and will be entered as the judgment of the Supreme Court.