## HOME FURNITURE CO. v. HAWKINS et ux.
### · No. 11746.

Court of ·Civil Appeals of Texas. Dallas.
June 22, 1935.

Rehearing Denied July 20, 1935.

Reed & Currie, R. J. Dixon, and W. M. Pierson, all of Dallas, for appellant.

Currie McCutcheon, of Dallas, for appellees.

JONES, Chief Justice.

Appellees, Ed Hawkins and wife, instituted this suit in the county court of Dallas county at law No. 2 against appellant, Home Furniture Company, a corporation, for conversion of certain described personal property, and for the loss, through negligence, of certain other personal property. Jack Carter, appellant's employee, was joined in this suit as a defendant, but judgment was entered in his favor and he is not a party to this appeal. The actual damages sought were alleged to be $272, and, in addition thereto, exemplary damages in the sum of $500. In a trial before a jury, judgment was rendered in favor of appellees for actual damages in the sum of $124.20 and $500 exemplary damages. The appeal has been duly perfected to this court, and the salient facts are:

Appellees, with their two children, in 1933 resided in a 4-room tenant house at 619 Millard street. Appellees are colored people and this is a resident section for colored people in the city of Dallas. On the morning of April 27, 1933, appellee's wife was employed as a cook and left her home about 6 o'clock in the morning; the husband was employed down town and left

their home about 7:15 in the morning, locking all doors of the house and fastening the screens. The children were taken by him to the home of an uncle. Appellant is a corporation and sells furniture. Something over a year previous to the occasion in question, appellant had sold to a colored man, by the name of De Witt Gorman, some furniture including a bedroom suite, a rug, kitchen cabinet, and a breakfast suite. This sale was made on the installment plan, on which weekly installments were supposed to have been made.

For approximately a year previous to the occasion in question, Gorman had made no payments, had moved from the address he gave when he bought the furniture, and had not been located. Jack Carter, an employee of appellant, in his testimony described himself as being what is called a "lost account" man. "We have a world of lost accounts, moves, and it is my job to go out and locate the moves, find them, and if they are bad accounts try to get them paying again or bring in the furniture. That is my duty." Carter was paid a salary, and, in addition thereto, was given 5 per cent. of the appraised value of the furniture brought in on these poor accounts. His instructions were to try to persuade the principal of a bad account to agree to turn over to him the furniture, and if he failed to do so to repossess the furniture by court proceedings.

On the morning of April 27, 1933, Carter located Gorman on Fleming Street, and asked about the furniture. Gorman stated that the furniture was at 619 Millard street, and Carter caused Gorman to go with him to that address. When they arrived in front of appellees' home, after failing to get Gorman to open the house with the skeleton key that he had, Carter opened the house with such key, went in with his 19 year old son and Gorman, according to Carter's testimony. A witness, who was across the street at the time, testified that Gorman never went into the house. The result was that a bedroom suite, a rug, a breakfast suite, a United States mattress, and a Hoosier kitchen cabinet were carried out of the house and removed to appellant's storeroom. Carter claims that Gorman told him he roomed at such place and that Gorman pointed out to him (Carter) the furniture he had bought from appellant, and that only this furniture was removed. There was another kitchen cabinet on the back porch at the time. There were 25 pounds of flour in the kitchen cabinet, and this was poured out in a pan on the floor, and two packages of bacon, aggregating seven pounds, were also thrown on the floor.

When Carter left the house, after the furniture was loaded onto the truck, he left all the doors open. When Ed Hawkins returned home about 4:30 in the afternoon, he discovered that his house had been forcibly entered, and there was missing the Hoosier kitchen cabinet, a rug, and a United States mattress belonging to him, also a bedroom suite belonging to Gorman, and a breakfast suite also belonging to Gorman; two suits of clothing, a pair of shoes belonging to Hawkins, and a 17-jewel ladies wrist watch, plated with white gold, were also missing. The 25 pounds of flour had been purchased the day before, and also the two packages of bacon had been purchased the day before. The flour had been scattered on the floor, and there were dog tracks over the flour. One package of bacon was missing. In other words, the bacon and flour were destroyed for use.

A short time after he arrived, appellee was informed that appellant's employees had entered the house and removed the furniture. He at once telephoned appellant and informed it that it had moved furniture belonging to him, and was told that they would return such furniture to him. He waited a while and then he and his wife and another woman went to appellant's place of business and lodged their complaint. At this time, Hawkins was informed that if he would tell them what had become of the oilstove purchased by Gorman he could have the furniture belonging to him. This he told them he could not do, because he did not know anything about the oilstove or where it was. After going to the police station and lodging their complaint, they were advised to consult an attorney, and this suit was instituted.

Appellees never bought any furniture from appellant; while some of the furniture bought by Gorman was in their house, it came there under the following circumstances: Gorman came to Hawkins a few weeks before the day in question and told him that he had been turned out of his house for failure to pay rent, and wanted to know if he could leave some of his furniture with appellees until he could get another house. He was permitted by appellee to do this, without paying rent and without appellees using such furniture. When Carter

forcibly entered the house, by use of the skeleton key on the morning in question, he never inquired as to who had charge of such house, but accepted Gorman's word that he roomed at such house, though it was evident that some one else lived there. Gorman was not a witness in the case, had never roomed at appellees' house, carried no key to appellees' house, and did not have permission to enter same in their absence. Appellant never tendered to appellees their furniture, and never repudiated the act of Carter in forcibly entering the house and taking appellees' furniture, but held the furniture and defended the case by filing a full and complete answer to the suit. The pleadings of both parties are sufficient to raise the questions discussed on this appeal.

The case was submitted on special issues, and the jury found that, on the occasion in question, appellees owned one United States mattress, one Hoosier kitchen cabinet, one 17-jewel wrist watch, one pair of shoes, two suits of clothing, 25 pounds of flour, and 7 pounds of bacon; but found that they did not own the rug in question.

Under appropriate submissions, the jury found the value of each of these items; totaling $124.20. The jury also found that appellant, through its agent or employee, Jack Carter, was guilty of negligence in leaving the two front doors of appellees' home unlocked; that appellant, through its agent, entered the home on April 27, 1933, without the consent or knowledge of the appellees.

The jury also found, under appropriate submissions, that the wrist watch, two suits of clothing, one pair of shoes, 25 pounds of flour, and 7 pounds of bacon, were lost to appellees as the proximate result of appellant's negligence in its agent leaving the doors open.

The jury also found, under appropriate submissions, that appellant, through its agent, Carter, took from the house and carried to appellant's place of business one United States mattress and one Hoosier kitchen cabinet belonging to appellees.

The jury also found, under appropriate submissions, that appellant acted with malice in the matter of entering appellees' home and removing the property therein, and the court correctly defined the term "malice" in connection with this submission; also the jury found that appellant was guilty of gross negligence in the matter of entering appellees' home and removing the property therein, and in connection with this submission the term "gross negligence" was correctly defined. In response to special issue No. 10, the jury found the exemplary damages to be in the sum of $500; in connection with this submission, the term "exemplary damages" was correctly defined. Preceding the submission as to what amount the jury would find as exemplary damages, the court told the jury that they should only answer this issue and name the amount, provided they had found that appellant was actuated by malice, as submitted in a previous issue, or was guilty of gross negligence; and also instructed the jury that, if they should find any amount of exemplary damages, such damages "should be reasonably proportionate to the actual damages which you have found (if any you have found)."

These findings by the jury are supported by substantial evidence and are adopted as the findings of this court. This being a county court case, and as the judgment will be affirmed, this court is not required to write an opinion, and will discuss only those contentions raised by appellant that appear to be the primary questions involved on this appeal, though we have carefully considered all of the other contentions made by appellant in its brief.

■ Appellant contends that the court erred in failing to submit the issue as to whether Jack Carter, appellant's agent and employee, in doing the things complained about, was acting within the scope of his employment. This issue was not concretely submitted to the jury; the submission being in this form, "Do you find from a preponderance of the evidence that the Home Furniture Company, through its agent, Jack Carter," did the things complained of? There was no specific objection made by appellant to the submission of the special issues because of this omission, nor was there any requested submission supplying such omission. In other words, so far as this record shows, at the time the issues were submitted appellant had no complaint because of the failure to submit the issue, as to whether Jack Carter, when he entered appellees' home by means of a skeleton key, and took therefrom the items of furniture belonging to appellees, on which appellant had neither claim nor lien, was acting within the scope of his authority; hence cannot now complain of the alleged omission.

■ The action of appellant, in refusing to turn back to appellees their furniture, unless they would inform appellant where

the missing oilstove was, and appellant's attempt in its pleading to justify the entry of Jack Carter into the house, because of a provision in the chattel mortgage executed by De Witt Gorman, and to which appellees were not parties, together with other circumstances, especially that of retaining the possession of appellees' furniture, secured in this rather high-handed manner, tend strongly to show that, if Carter did not have such authority in the beginning, appellant ratified and adopted his acts. The assignments of error in this respect do not show reversible error.

Another contention is made, that the evidence does not warrant the finding of malice, and that there was therefore no basis for exemplary damages. The finding of malice we think is sustained by the evidence, but that is not the only basis for exemplary damages. The jury also found that appellant, through its agent Carter, was guilty of gross negligence; this finding is authorized by pleading and is sustained by evidence, and is another basis for exemplary damages. We overrule the assignments of error in this respect.

Again it is urged that the exemplary damages awarded is disproportionate to the amount of actual damages suffered, and evidences the fact that the jury was influenced by passion in making its finding on the amount of exemplary damages. We cannot agree to this contention. 13 Tex. Jur. p. 248, discusses this identical question, and we quote therefrom: "It has been found to be difficult to set any fixed or prescribed limits to the discretion of the jury or in fact to prescribe any rule whatever to guide them in assessing exemplary damages. The amount to be awarded in any case is measured by the rule of just punishment, rather than that of fair compensation. While the amount should be large enough to command respect for the law and to deter others from similar infractions, it should not be excessive or oppressive. Of course, the plaintiff may not recover exemplary damages in excess of the amount demanded in the complaint. The amount of exemplary damages should be reasonably proportioned to the actual damages sustained. The ratio in any particular case depends upon the facts; and necessarily much is left to the discretion of the jury."

In Cotton v. Cooper (Tex. Com. App.) 209 S. W. 135, affirming the Court of Civil Appeals, 160 S. W. 597, there was a verdict for $3,500 exemplary damages and $400 actual damages, and this judgment was sustained in both opinions. In St. Louis S. W. Ry. Co. of Texas v. Thompson (Tex. Civ. App.) 108 S. W. 453, verdict for $2,000 exemplary damages and $500 actual damages was sustained. In Galveston, etc., Co. v. Patterson (Tex. Civ. App.) 46 S. W. 848, a verdict for $1,500 exemplary damages and $500 actual damages was held excessive as to both exemplary and actual damages, and plaintiff was required to remit the exemplary damages down to $500 and the actual damages down to $250.

The question of the measure of exemplary damages comes under the general rule that, where the law furnishes no legal measure of damages and they are unliquidated, the amount to be awarded rests largely in the discretion of the jury; and unless the award is so large as to indicate that it is a result of passion, prejudice, or corruption, or that the evidence has been disregarded, the verdict of the jury is conclusive and will not be set aside as excessive, either by the trial court or on appeal. 13 Tex. Jur. pp. 261–267, § 148. In Tynberg v. Cohen, 76 Tex. 409, 416, 13 S. W. 315, 316, in considering a similar question, the Supreme Court makes this observation: "It has been said in some cases that exemplary damages should not be disproportioned to actual damages, but it was not meant by this that the one should be any exact or approximate ratio to the other. All that was meant was that the imposition of heavy exemplary damages, when the actual damages recoverable were small, was a fact which ought to be looked to, to determine whether passion rather than reason dictated the verdict."

In the instant case, the amount of exemplary damages is proportionate to the amount of actual damages, approximately at the ratio of 4 to 1. Under the circumstances of this case, we do not believe that this ratio evidences the fact that the jury followed the dictates of passion rather than reason in rendering this verdict. This contention is overruled.

We have carefully examined all assignments of error, and, in our view, none present reversible error; therefore, in our opinion, the case should be affirmed, and it is so ordered.

Affirmed.