People's Building, Loan, and Savings Association v.
John F. Keller.

Decided March 18, 1899.

1. Usury—Constitutional Construction.

All contracts, whether written or verbal, or partly both, are usurious if they provide for a greater rate of interest than 10 per cent per annum, under the amended article of the Constitution relating to usury, and which is a self-executing provision. Const., art. 16, sec. 11, as amended in 1891.

2. Same—Evidence of Other Loans—Agent's Authority.

Evidence that an agent of a building and loan association, in making other loans, agreed that stock payments should be applied to the loan, is admissible as tending to show authority in him to make a similar agreement with reference to plaintiff's loan, and that the form of the loan was but a device to evade the usury laws.

3. Same—Parol Evidence—Building and Loan Association.

Parol evidence is admissible in, support of a plea of usury to show that the agent of a building and loan association who made the loan agreed that the stock payments should be applied to the loan, although the written contract provided otherwise.

4. Same—Contract Ultra Vires—Foreign Corporation.

A foreign building and loan association can not escape the penalties attached to a usurious contract made through its agents upon the ground that such contract was beyond its charter powers, and that it therefore had no authority to make or ratify it.

5. Same—Building and Loan Association Premium.

The premium specified in a loan contract of a building and loan association' is deemed to be but another name for interest.

6. Building and Loan Association—Right of Borrowing Stockholder.

A borrowing stockholder in a building and loan association asserts his right to have the value of his stock applied to the discharge of his debt as provided in the by-laws by notifying the association of his desire to at once discharge his debt and avail himself of all rights held by him as a stockholder, and by instituting suit to have certain usurious payments made by him applied to the principal sum and to have his bond on the deed of trust canceled.

Error from Wichita. Tried below before Hon. George E. Miller.

*L. T. Miller* and *Pruit & Smith*, for plaintiff in error.

*Edgar Scurry* and *J. H. Barwise*, for defendant in error.

Conner, Chief Justice.—This was an action brought by defendant in error, John F. Keller, against plaintiff in error, the People's Building, Loan and Savings Association, in the District Court of Wichita County, Texas, on October 14, 1897, to have certain sums of money, alleged to have been paid by said Keller to said loan association upon an alleged usurious bond and contract entered into by said Keller and said loan association on the 31st day of August, 1892, applied on the principal sum due on said indebtedness, and to have judgment canceling said bond and a lien by deed of trust given therefor, and for costs and general relief.

It is alleged in the petition of plaintiff below, among other things:

"That heretofore, to wit, on the 31st day of August, 1892, plaintiff

made, executed, and delivered to the defendant, at Wichita Falls, Wichita County, Texas, his certain obligation and contract in writing, and on the same date plaintiff entered into a verbal and parol contract with defendant, by the terms of which said written and verbal and parol contract plaintiff promised and agreed with defendant to pay to it in monthly payments of $22 per month. * * *

"That said $22 monthly payments are made up as follows: $5 is termed 'interest' payment, and $5 is termed 'premium' payment, and $12 is termed 'stock' payment; and the $3 quarterly payment is made up as follows: $3 per quarter and termed 'dues' payment. * * *

"That the real transaction by and between plaintiff and defendant was and is a loan by defendant to plaintiff of the sum of $1050, and that said loan was made in the manner and took the form aforesaid for the sole and only purpose of evading the usury laws of Texas.

"That the pretended 'stock' contract, 'premium' contract, and 'dues' contract, and the pretended 'stock' payment, 'premium' payment, and 'dues' payments, were and are only devices and subterfuges resorted to by the defendant to evade the usury laws of the State of Texas and to enable the defendant to charge and collect from plaintiff a greater rate of interest than the legal rate of 10 per cent per annum on the amount loaned, $1050.

"That said pretended 'stock' contract and loan were made at the same time, and were one and the same transaction, and were made for the sole and only purpose of obtaining a loan by plaintiff from the defendant, and said stock and loan contracts were not separate transactions, but were one and the same transaction."

The petition set out the trust deed, and alleged that on September 22, 1892, and each succeeding month and quarter thereafter, he had paid the monthly payments agreed upon, until the payment in July, 1897, and prayed for cancellation of the bond, trust deed lien, etc.

Plaintiff in error answered by general denial, and specially setting up the bond and trust deed, application of Keller for stock, etc., alleging, in substance, that the same constituted the contract for the parties, and that by virtue thereof, under its articles of incorporation, $708 of the amount paid by plaintiff constituted payments on "stock" purchased, and that plaintiff was still indebted to it in the sum of $625, and prayed for judgment and foreclosure of lien.

The case was tried by a jury, who returned the following verdict: "We the jury find for the plaintiff," upon which the court rendered judgment in Keller's favor canceling the bond, trust deed lien, and for costs, etc., as prayed for by plaintiff, from which judgment plaintiff in error has duly sued out writ of error, assigned errors, etc.

The following are the facts:

Plaintiff in error at all times herein mentioned was incorporated as the People's Building, Loan, and Savings Association under the laws of the State of New York, and resident therein at Syracuse, but with agents in Texas.

In August, 1892, defendant in error applied to one Joseph F. Edwards, an agent of plaintiff in error at Wichita Falls, Texas, for a loan of money for the purpose of erecting a house on the lots described in his petition. Keller informed such agent that he wanted to borrow $1200, and to repay it in a fixed time, to wit, within five years, on monthly payments. Keller was informed by Edwards that before such loan could or would be made to him it would be necessary for him, Keller, to subscribe for twelve shares of stock of the association, of the face value of $100 per share, and to execute a bond and trust deed on the lot in question to secure the same; and it was finally agreed between Keller and Edwards that Keller would so do and that Keller should pay the sum of $22 each month and $3 every three months during five years.

Thereupon Keller made on written forms of the company applications for a loan of $1200 and for twelve shares of stock of the par value of $100 per share, and executed a bond and trust deed. The bond and trust deed are not set out in full in the statement of facts, the following brief statement thereof only appearing in the record, to wit:

"The plaintiff read in evidence the following instruments:

"1. The certain obligation and contract in writing referred to in plaintiff's petition, the same being a bond given by said plaintiff to defendant in the sum of $2400, dated August 31, 1892, conditioned that said plaintiff shall pay to said defendant or assigns the sum of $1200 in five years from date, and also pay the further sum of $5 contribution of premium and $5 contribution of interest, each and every month from date, said payments to commence on or before Saturday, September 24, 1892, and to be continued and made on or before the last Saturday of each and every month thereafter; then this obligation to be void, otherwise to remain in full force and virtue.

"2. The deed of trust in writing referred to in plaintiff's petition, dated August 31, 1892, in which it is recited that plaintiff and his wife conveyed to one E. A. Walton, trustee, lot No. 3, block 150, in the town of Wichita Falls, Texas, to secure to the defendant the payment of $1200 in five years from date, and also the payment of $5 contribution of interest and $5 contribution of premium each and every month from date of said deed of trust, said payments of interest and premium to commence on or before Saturday, September 24, 1892, and to be continued to be made on or before the last Saturday in each and every month thereafter, to be paid to the treasurer of defendant according to the conditions of the bond this day executed and delivered by the said J. F. Keller to said party of second part (defendant association). It was also recited that if these payments of principal and installments of interest and premium were made as they became due, that said trustee was to reconvey the property to the plaintiff, at his expense; but if the plaintiff at any time failed to pay the principal or any interest or premium money as the same became due, then the whole principal sum and any interest and premium due shall immediately become due and payable, and said trustee may advertise and sell the property under said deed of

trust and apply the proceeds to the expense of the sale and the payment of said indebtedness, and the residue, if any, to said plaintiff and his wife. This deed was duly acknowledged by plaintiff and his wife and delivered to defendant and recorded in· record of trust deeds and mortgages of Wichita County, August 31, 1897."

Nor are the applications above referred to set out, it being stated merely that defendant offered: "(1) Plaintiff's application to purchase twelve shares of defendant's stock, made on August 22, 1892. (2) Plaintiff's application for loan of money of $1200 to defendant August 22, 1892, agreeing to give defendant a deed of trust to secure said loan on lot 3, block 150, town of Wichita Falls, Texas. (3) Assignment of said twelve shares of stock to defendant as collateral security for said loan assignment, dated October 15, 1892, being the same instrument attached as an exhibit to the deposition of O. N. Whitney. (4) The affidavit of said plaintiff, stating among other things that he was the owner of twelve shares of the stock of defendant association, par value $100 per share, dated August 31, 1892."

It does not appear in evidence that there was any agreement on Keller's part to make any payments as "stock" payments, except in so far ·as it is to be inferred from the fact that one of the bylaws provided that $1 per month should be paid on each share of stock in class "A;" that class "A" was the class subscribed for by Keller; that the bond provides for $5 per month as "premium" and $5 as "interest," and the total monthly payment was to be $22, and the further fact that Keller testified that it was agreed by Edwards "that the stock payments would be repayments of my loan."

However, we find that the transaction was intended by Keller and accepted by Edwards as a loan only; that the purchase of the stock by Keller was not as an investment, but as a means to procure the desired loan, and was so understood by Edwards, and that it was agreed at the time between Keller and Edwards that the entire amount of $22 per month was to be applied to the repayment of the loan and its interest; so that if of this $22 per month $12 was "stock" payment, then it was so agreed that "stock" payments should be applied to Keller's debt. There is no direct evidence, however, that this purpose of Keller and this agreement as to application of "stock" payments was known· to any officer or agent of the plaintiff association other than said Edwards.

Upon the execution of the foregoing contracts, etc., Keller's application for a loan of $1200 was accepted, and the defendant association advanced to him the $1200, less a bonus of 10 per cent thereof, as follows: September· 19, 1892, $360; September 29, 1892, $360; and the third and last installment on October 10, 1892, in the sum of $360; aggregating $1080. The theory of each advance was $400, but 10 per cent or $40 being deducted as a "bonus," the actual advance to Keller was $360 each time, as stated. Upon October 15, 1892, Keller duly assigned said twelve shares of stock as additional security for said loan.

Upon the loan so made Keller regularly each month paid to various

agents of defendant association the sum of $22, until August, 1897; that is, he made fifty-nine monthly payments of $22 each, and quarterly payments of $3 each, aggregating $48.25, making a total of $1346.25. This was credited to Keller's account by the loan association as follows: $580 on interest and premium, $58.25 on expense account, $597.51 on stock, with $111.49 charged against it as losses, being 23 per cent of the face value of the stock.

Keller some time before the time for the August, 1897, payment, by his attorney, caused a letter to be written and duly mailed to the association at Syracuse, N. Y., to the effect that before making this payment he desired them to send to their agent at Wichita Falls for delivery due releases of his trust deed and obligation, and that upon such receipt he would make this payment. To this no answer was received, and Keller soon thereafter instituted this suit. The proof fails to affirmatively show whether this letter was actually received or not, but the secretary of the company testified that he had charge of the business and correspondence of the association at Syracuse, New York, and he fails to deny the receipt of said letter, and we think the fair inference is that such letter was in fact received by the association.

The evidence further shows that upon receipt of Keller's application for loan and twelve shares of stock the secretary granted the application and issued and duly mailed to Keller certificate No. 15,652, for said twelve shares of stock. The terms of this certificate do not appear in the record, nor does it appear that Keller ever in fact received it. He testified he never did receive any certificate for stock, nor any stock.

It was further shown in behalf of plaintiff in error that on January 11, 1896, the board of directors passed a resolution declaring that there had been a depreciation in the value of assets to the extent of 26 per cent of the face value of the stock, and the secretary was directed to deduct this from the book value of the stock. The secretary did so, after using $40,000 undivided dividends, which resulted in a deduction of 23 per cent. The loss so charged against Keller's stock was the said sum of $111.49. It was also shown that during the continuance of Keller's payments there had been four dividends declared. Keller's stock or account was credited with $16.72 as the result.

Said secretary testified on the trial that, "considering the amount paid into the association by Keller as stock dues or on account of his certificate, together with the earnings of said stock, less the amount paid into the expense fund and less the amount charged against Keller's certificate, the said certificate is now worth $613.23." This evidence is uncontradicted.

It appears further that the association had articles of association and by-laws in force at the time of the issuance of the Keller stock and of the granting of a loan to him, all of which, however, do not appear in the record before us, the recitation being that "the defendant then introduced the following portions of the articles of association and by-laws of defendant, to wit." We will here insert such portions only as are deemed

material to the consideration of the questions presented, with a finding of what does not appear, to wit:

"Article III.—Qualification of Members. Sec. 1. Any person may become a member or shareholder of this association by filling out and signing the required application, which is hereby made a part of such applicant's contract with this association."

"Article X.—Installments. Sec. 1. All shareholders shall pay or cause to be paid a monthly installment of one dollar on each share named in his or her certificate in class 'A.' ＊ ＊ ＊

"Sec. 2. The mortgages taken by this association as hereinbefore prescribed may be redeemed or changed in the manner provided for in the by-laws of this association."

"Sec. 3. Members holding certificates in class 'A' shall be entitled to withdraw the amount paid into the loan fund on the same, provided such certificates have been in force for three years or more, and that they are in good standing on the books of the association at the time the application for withdrawal is made........Notice of thirty days may be required by the association from members wishing to withdraw the payments on such stock, and the time and manner of paying shall be the same as on stock at maturity, provided that only one half of the receipts of the association in any one month shall be applicable to the payment of such withdrawals." ·

The relation of a stockholder to the incorporation does not clearly appear. Nor does it appear just what authority is invested in the agents appointed by the manager. Nor do we find any by-law or article of association authorizing the board of directors to declare a depreciation of assets and direct a charge against the value of the stock while a going concern.

We have been at some pains to fully state the case, because of the zeal and ability with which counsel for plaintiff in error have presented it. We will now consider the assignments of error.

The first error assigned is as follows: "The pleadings of the plaintiff are insufficient in law, and do not show that the usurious interest alleged to have been reserved and taken was so reserved and taken by and through a written contract, but said pleadings show affirmatively that the contract to take and reserve said usurious interest was not a written contract, but a contract partly oral and partly written. This is assigned as fundamental error."

This assignment of error is predicated upon the idea (1) that the usurious contract set up is partly in writing and partly in parol, and (2) that no verbal contract can be usurious.

The petition in this particular is susceptible of the construction that a written contract was entered into and at the same time a verbal contract was entered into, and that *both* were usurious. A contemporaneous parol contract will not be admitted to add to or take from a written contract, but nothing appears in the allegations of the petition necessarily imputing the idea that the written contract mentioned is not usurious,

or that the terms of the parol contract are necessary in order to establish its usurious character, or that the two contracts are necessarily interdependent.

However this be, there is another view of the point under consideration that would seem to be determinative of the question. Our statute (Revised Statutes, article 3103) provides that parties to any written contract may agree for a rate of interest not to exceed 10 per cent per annum, and the next article provides that "all *written* contracts * * * which may violate the preceeding article by stipulating for a greater rate of interest than 10 per cent per annum shall be void for the * *, * interest," etc.

But on August 11, 1891, section 11 of article 16 of our State Constitution was so amended as to read as follows: "All contracts for a greater rate of interest than 10 per centum per annum shall be deemed usurious," etc. This provision seems to be self-executing, without the need of a legislative act to make it effective; and if the article of the Revised Statutes quoted is to be construed as insisted upon in behalf of appellant, we have the constitutional declaration that *all* contracts, whether written or verbal or partly both, are usurious that provide for a greater rate of interest than 10 per cent per annum. We therefore conclude that plaintiff in error's first assignment should be overruled.

In the second assignment it is urged that the court below erred in permitting, over objection, one J. W. Morris and George Giddings to testify that they also had been individual separate borrowers from plaintiff in error, that they had severally transacted their business with Edwards, acting as agent of the loan association, and that they had been required to take stock, and that a "premium" for lending the money was charged and taken out of the amounts loaned, and that in the case of Morris it had been agreed that the "stock" payments should be applied to the loan. The objection to this testimony was that it was "irrelevant, immaterial, incompetent, and illegal," and it is here urged that it did not appear that the Morris and Giddings contracts were usurious, or in any way connected with the Keller contract, and that the evidence was not admissible to show that the Edwards contract was usurious.

We do not think it will be contended that proof that the Morris and Giddings contracts were usurious would prove usury in the Keller contract. But we have carefully examined the evidence of these two witnesses, and, as contended by plaintiff in error, it nowhere appears therefrom that any effort was made to show that the Morris and Giddings contracts were usurious. Among other things, it was alleged that Edwards was the agent of plaintiff in error, and that the "stock" payments were to be applied to the loan of Keller. We think the testimony admitted was certainly competent as tending to show that Edwards was acting as such agent, and in this particular case as tending to show authority in Edwards to so agree to the application of stock payments, inasmuch as on the trial below no effort was made to show any limitation of authority in Edwards to so do.

If in fact Edwards while acting as agent made contracts of such character without protest or repudiation on the part of his principal, plaintiff in error, the fact would tend to raise the inference that such contracts were so made by Edwards with the knowledge and concurrence of plaintiff in error, and that the provision in the by-laws for stock payments was but a device, as alleged, to avoid the effect of our usury laws. If error to permit said witnesses to testify that in the contracts by them made both a "premium" and "interest" had been charged, it is entirely harmless, inasmuch as the written contract of Keller so provides beyond dispute. This is not controverted. We think this assignment should be overruled.

The third and seventh assignments of error call in question the action of the court below in permitting Keller to testify that it was agreed between himself and Edwards, the agent, that the $22 per month to be paid by Keller, including what is designated by plaintiff in error as the "stock" payment, should all be applied to the repayment of the loan, it being insisted that such testimony was but contemporaneous with Keller's written contract and tended to contradict and vary the same.

It will be noted that the bond and trust deed, as they appear in the record before us, nowhere provide for any payment save $5 per month as a "premium" and $5 per month as "interest." Nothing is therein said about "stock" payments, nor do they refer to or make part thereof any by-law of the association providing for stock payments; nor does any such provision or reference appear in any "application" for a loan or for "stock," or in any other instrument in writing signed by Keller, so far as shown in this record. A by-law appears which seems to require $1 per month to be paid by subscribers for stock upon each share of stock in class "A" by them subscribed for, but nothing appears in the record, as we construe it, showing that Keller knew of the existence of such by-law or became bound by its terms.

But if we assume that the bond, trust deed, and other instruments signed by Keller made such by-law part thereof or expressly provided that Keller, in addition to the $5 premium and the $5 interest, should also pay the further sum of $12 per month on the twelve shares of stock for which he subscribed, then it is true that Keller could not, agreeably to the rules of the law, testify that such "stock" payments were in fact to be applied to the repayment of the money advanced to him?

The general rule of law which inhibits parol testimony that in any way adds to, takes from, or varies or contradicts a written contract is well understood, but it has long been held that such testimony is received to show the real transaction in cases of fraud, accident, or mistake. In the case before us, the petition expressly alleged a legal fraud. It in effect expressly alleged that the "stock" payment was but a device to avoid the effect of our usury law; that all payments, under whatever name designated were to be applied to the repayment of the contemplated loan; that the contract for stock and its payment was not intended nor understood as an "investment," but that the real transaction was a loan,

and that the provisions relating to the stock were but part of the general scheme and device to secure more interest than our laws permitted. This petition was duly verified by the oath of Keller. It was met by the general exception and denial and special pleas setting up the written contract, all unsworn to.

To hold that parol testimony can not be received, under such circumstances, to show the real transaction, is to hold that the courts of this country are powerless to afford relief from fraudulent practices and devices that may be imposed by written instruments signed by necessitous people. Many instances might be cited in which courts have relieved from cases of accident, fraud or mistake, and in cases, as in this, where the instrument is directly and appropriately attacked for fraud, we think the real transaction may be shown by the best evidence attainable. Such evidence seems to have been admitted and expressly approved in the Rising case, 34 Southwestern Reporter, 147, for while the decision does not clearly show just what Rising's testimony was, and the record in that case is not accessible to us, yet the court held it was not error to receive his testimony, and the inference is strong that his testimony was received to show the real transaction, and in support of the conclusion reached that the real transaction was other than as indicated on the face of the papers. We conclude that the third and seventh assignments should be overruled.

The fifth assignment of error is as follows: "The court erred in its second subdivision of its charge, said charge being to the prejudice of the defendant and calculated to mislead the jury, and which charge is in the following words: 'Second. If you find and believe from the evidence that the plaintiff took the shares of stock in controversy in order to secure a loan, and not as an investment, and that he had paid the sums of money mentioned by him, then you will find for the plaintiff;' said charge giving the jury a single and wrong test of the plaintiff's right to recover, irrespective of the purpose for which the defendant sold him the stock, or of any or all of the other facts of the case, which error was called to the attention of the court in defendant's motion for a new trial."

The court's charge contained but four clauses. In the first the court gave a definition of agency. The second is quoted in the above assignment. The third, in effect, was the converse of the proposition contained in the second, and the fourth and last instructed the jury that they were the judges of the credibility of the witnesses and the weight to be given to the testimony. Thus the ground for the plaintiff in error's contention that all of the issues as made by the pleadings were not submitted to the jury may be seen at a glance.

It may be conceded that every litigant has the right to have every issue so submitted, but it has often been held, not only in civil causes, but in causes involving life and liberty, that a given failure to do so on the part of the court was not error. It is not here contended that the fact thus submitted to the jury was not one of the issuable facts, and

therefore erroneously submitted. The contention is, in effect, that this fact should have been coupled with the further fact that the purpose of plaintiff in error also was to effectuate a loan only, and not a sale of stock as an investment. It is the writer's opinion that if the evidence was such as to make this further fact issuable, plaintiff in error should have requested an instruction supplying the omission. It is the uniform rule of this court that mere errors of omission in the charge of the court will not avail the losing party unless such error of omission be supplied or the court's attention be directed thereto by a requested instruction. The other members of the court, however, are inclined to the opinion that the error in the charge was not one of omission merely.

There is another familiar rule of law that the writer thinks can well be applied to the objection made to this assignment, and that is, in effect, that if a fact put in issue by the pleadings be proven by uncontroverted evidence, the court may assume such fact as proven, and may even so instruct the jury. The omission complained of was at most but an assumption on the part of the court that every other material fact, including the purpose on the part of the plaintiff in error, was established, and that upon the finding of the fact submitted in Keller's favor, he would be entitled to recover. The purpose of plaintiff in error in the transaction can only be determined from the acts and declarations of its agents and officers. But one of them testified on the trial below, a Mr. Whitney, the secretary of the plaintiff in error since December, 1894, as he testifies. We have carefully considered his testimony more than once in this investigation. He nowhere attempts to state the purpose of plaintiff in error or any officer thereof in consummating the Keller transaction. His testimony is almost exclusively as to facts appearing upon the face of the writings involved, the minutes of his office, payments as shown by checks sent Keller, book entries of payments made by Keller, etc. He indicates no personal knowledge of the matters about which he testifies. He nowhere says that the papers attached to his deposition were all the writings on the subject. There must have been some correspondence between the company and Keller and its agent, Edwards; yet we find no correspondence offered on the trial below. His testimony does not exclude an inference that there may have been such letters in his office by Edwards frankly admitting the matter as testified to by Keller. It does not appear who was the secretary or managing officer of plaintiff in error in August, 1892, when this Keller transaction occurred.

Keller testified, in effect, that the stock purchase was not an investment; that the transaction was a loan merely, and that all payments were to be applied on his debt; and that this was so understood and agreed between him and Edwards. The writer fails to find any evidence whatever that contradicts this, save the inferences to be drawn from the form in which the written proceedings were made to appear, as exhibited by plaintiff in error. Edwards himself was not tendered by plaintiff in error as a witness. He did not testify. If, in any event, the purpose of the

transaction could be shown by evidence aliunde the writings, who of all plaintiff in error's agents would be most likely to know what it was? Edwards, certainly. Or if not him, then its managing or corresponding officer at the time the transaction occurred.

In the absence of the testimony of Edwards or of such officer, and in the absence of any statement or writing from which its falsity could reasonably be inferred, we think the court below could well assume the fact to be as testified to by Keller, or at least could well have assumed that Edwards knew all about the matter, and understood and agreed to it as stated by Keller. It has been suggested, however, in the very able brief of plaintiff in error that it would not be bound by Edwards' knowledge or agreement, if any, to such effect, because the incorporation could not consent to nor ratify an act beyond the powers vested in it by the law of its creation. I do not think this case one in which the principle invoked can properly be applied. The laws of New York governing such incorporations were not proven on the trial. The authority of its agent Edwards was not shown. In the absence of such proof, we are not required to consider them or to determine the limits of the power of the defendant incorporation or of its agents.

But if it be assumed to be as insisted in behalf of plaintiff in error, the writer can not give assent to the proposition that it would be thereby relieved from the consequences of the unlawful acts and devices, if any, of its agents and managing officers. Under the laws of New York it may have been lawful or unlawful to charge a greater rate of interest than 10 per cent per annum. Under its charter it may not have been authorized to charge any such rate, and the act of so charging or receiving a greater rate might have subjected its agents to severe penalties. Yet if it in fact be shown, under our law, in any given case, that defendant or its agents did make a contract providing for the payment of a greater rate of interest than 10 per cent per annum, under whatever guise or name, then our courts have no other duty to perform except to declare the usurious character of the contract and to impose the penalty provided.

There is another view that we all think conclusive of this case. The bond or written contract executed by Keller on its face provides that he shall pay plaintiff in error $1200 and the sum of $5 per month as "premium" and $5 per month "interest." It is certainly the law of this State that the "premium" therein specified is but another name for interest. Loan and Investment Co. v. Stone, 46 S. W. Rep., 67; B. and L. Assn. v. Biering, 86 Texas, 476; Abbott v. B. and L. Assn., 86 Texas, 467.

It is also undisputed in the evidence that upon the execution of this contract by Keller the plaintiff in error deducted from the amount of the proposed loan and from the face of Keller's obligation a "bonus" of 10 per cent, or $120, so that in effect plaintiff in error received an advance payment of $120, together with a contract for the sum of $10 per month interest on $1200; or plaintiff in error received Keller's obligation for $1200, with contract for $10 per month interest thereon for $1080 cash actually advanced to Keller. A simple calculation demonstrates in

either event, that more interest is provided for than 10 per cent per annum, and that the contract relied upon by plaintiff in error, independent of all other evidence, is usurious. Jackson v. Cassedy, 68 Texas, 282; B. and L. Assn. v. Lane, 81 Texas, 369.

The testimony also proves beyond dispute that Keller, exclusive of what is termed by plaintiff in error as "stock" payments and quarterly dues of $3 per quarter, actually paid on his contract fifty-nine monthly payments of $10 each, aggregating $590. This amount, in any state of the case must be applied to Keller's debt, the $1080 actually received by him. By so doing we have a balance of $490 due plaintiff in error, according to its contention, on its loan. If we admit that authority has been shown for the directors to estimate the fact and extent of depreciation of assets, and to charge Keller's account with $111.49, as was done, yet plaintiff in error's witness, Whitney, testified, as hereinbefore appears, that Keller's stock at the time of the trial was worth $613.23, and that Keller had paid on stock $708. This evidence is uncontradicted. The articles of incorporation and by-laws hereinbefore quoted provide that payments on stock constitute a part of the loan fund. It will also be noted that it is also provided in one of them that "members holding certificates in class 'A' shall be entitled to withdraw the amount paid into the loan fund."

Keller is shown by the undisputed evidence to be within the class having this privilege. His stock was in good standing, so far as appears from the record, at the time he wrote the defendant corporation in August, 1897, that he wished them to send proper acquittances, etc. His certificate had been in force for more than three years. No "notice" was required of him by the association. The by-laws in question provided that "the time and manner of paying shall be the same as on stock at maturity." At maturity it is not questioned but that Keller would be entitled to have the payments made into the loan fund, i. e., stock payments, or the value of his stock, at all events, applied to the discharge of his debt. As we have seen, after the application of the usurious interest, the remainder due under plaintiff in error's theory of the case is more than met by the undisputed value of Keller's stock.

In the Stone case, cited supra, this court held, under similar provisions, that the institution of that suit "should be treated as an assertion by a borrowing stockholder of the right secured to him * * * to repay his loan and withdraw his stock, and on account of our law against usury, to have the court make such application of the payments made as would accomplish that result and effect a cancellation of the mortgage, bond and * * * stock." In the case now before us Keller not only instituted suit, but before doing so wrote defendant, the receipt of which is not denied, in terms sufficient to indicate his desire to at once discharge his debt and to avail himself of all rights held by him as a stockholder. To this no objection appears to have been urged by plaintiff in error, and we think that in this case also should the institution of the suit by Keller, under all other circumstances, be construed as an assertion of a

right secured to him to have the value of his stock applied to his debt. If correct in this, it results that no other judgment than the one obtained in the court below could have been legally had.

In addition to all that has been said before, Keller testified, in effect, that at the time of the loan in question it was agreed that "stock" payments should be applied to the repayment of his debt. This proof is undisputed, and we find the fact so to be. A number of cases in our own courts have been cited in which it has been held that stock payments should not be applied to the liquidation of the borrower's debt. But so far as we have been able to determine, in no one of them did it affirmatively appear without contradiction that it had been so agreed. The usual expression on the point is that, *"in the absence of an agreement"* to that effect, stock payments would not be applied by the court to the borrower's debt. Savings and Loan Co. v. Everhart, 18 Texas Civ. App., 192; Sweeny v. Loan Assn., 26 S. W. Rep., 290; Blakely v. Loan Assn., Id., 292.

We have no purpose herein to differ with this line of authorities, but in this case there *was an agreement,* and in cases of fraud, where the transaction is directly attacked as such, and as a mere device and scheme to defeat the effect of our usury law, we know of no principle requiring us to reject the testimony by which the fact in this case was established. Nor when the fact is established do we perceeive any just reason why its legal and full effect should not be declared by the court.

This disposes of all the assignments of error. We think, upon the whole case, that the judgment below was the legal sequence of the uncontroverted proof, and that the error of the court was without prejudice to the plaintiff in error, and that the judgment of the District Court should in all things be affirmed; and it is so ordered.

*Affirmed.*