**SIGNATURE INDORSEMENT COMPANY et al., Appellants,**

**v.**

**W. J. WILSON, Appellee.**

**No. 7646.**

Court of Civil Appeals of Texas.

Texarkana.

June 8, 1965.

Rehearing Denied July 13, 1965.

Fred S. Abney, M. C. McLain, Abney & Burleson, Dallas, Dean Moorhead, Austin, for appellants.

Edward R. Vinson, Fritz, Vinson & Stevens, Dallas, for appellee.

DAVIS, Justice.

Appellee-plaintiff, W. J. Wilson, sued two sets of defendants, viz: (1) Signature Indorsement Company, Signature Indorsement Co., Inc., Signature Loans, Inc., Mid-Southern Service Company, Finance Operating Company, Service Management Company, Virgil C. Moore, alter ego of the loan companies, and W. Lee Moore, Jr., alter ego of the loan companies, and (2) Crown Loan Brokers, Inc., No. 7, formerly McCarty Finance Service, Inc.; Quick Loan Service of Big Springs, Inc., Union Finance Co., Inc., Consumer Discount Corp., Suburban Loan Corp., Paul R. Luther, Sr., and Paul R. Luther, Jr., alter egos of said corporations for (a) usury double damages (b) actual damages resulting to W. J. Wilson and his wife, Mrs. Frances Wilson, because of unreasonable contacts from said loan companies and their employees in an effort to collect usurious balances upon purported loans made to W. J. Wilson, and (c) exemplary damages because of malice exhibited on the part of said loan companies and their employees by their collection contacts. The suit was filed September 24, 1959. It is alleged that appellants-defendants, Signature Indorsement Company and W. Lee Moore, Jr., (in their amended motion for new trial) had filed a cross-action against Quick Loan Service of Big Springs, Inc., and McCarty Finance Service, Inc. There is no cross-action in the record. There is an order in the transcript dismissing the purported cross-action. The record does not show any service of any process whatever on the cross-defendants. According to a statement in a brief, the Quick Loan Service filed an answer to the cross-action on April 20, 1964, after the cross-action had been dismissed and on the date the trial commenced.

In 1962, W. J. Wilson made a settlement with Paul Luther, Sr., and Paul Luther, Jr., owners of the Quick Loan Service and Crown Loan Brokers, Inc., and affiliates for a total sum of $810.00.

At the beginning of the trial, appellee and appellant entered into the following stipulation:

"For the purposes of this case only, and without the defendants admitting that the charges, collected as insurance premiums and endorsement fees by Signature Loans, Inc., Mid-Southern Service Company, d/b/a Signature Indorsement Company and Signature Indorsement Company, in connection with the transactions between these companies and the plaintiff, W. J. Wilson, were in fact interest, as claimed by the said Wilson, and without plaintiff admitting that such charges were for the purposes named, the plaintiff and said defendants herein stipulate and agree that said defendants handled a series of loan transactions for plaintiff in connection with which contracts were made requiring payment of the charges shown on the schedule attached hereto, and that said defendants received payments thereupon from plaintiff as set forth in such schedule.

"All of the loans made were payable in 3 months. The $23.65 transactions were payable $1.90 per week, for 11 weeks, plus a final payment of $2.75. The $36.30 transactions were payable $2.95 per week for 11 weeks, plus a final payment of $3.85.

"Signed and dated the 11 day of January, 1963."

Appellee alleged that on March 31, 1958, he borrowed $15.00 from Signature Loans, Inc., and that he executed a note in the total sum of $23.65. From then until May 2, 1959, he executed seven renewal notes. By the renewals he received an additional $30.16, making a total of $45.16 as the result of the loans. Appellee paid back $100.46. Appellee alleged that the claims of the balances on the notes were usurious, illegal, null and void, and unconstitutional; that the appellants contacted appellee and his wife at their places of employment in order to collect the void notes, and such collection efforts were unreasonable and in reckless disregard of the health and welfare of appellee and his wife; that the collection efforts by appellants to try to collect the void notes constituted a course of harassment that resulted in emotional distress, illness, and other bodily harm; that all of the acts of appellants were willful, wanton and malicious; that all of the acts were the proximate cause of the illnesses they suffered, including extreme nervousness, headaches, loss of sleep, reduction in ability to work, extreme fatigue and weariness, harmful loss of weight of appellee Wilson from 165 to 149 lbs., heart pains, loss of appetite, and chronic depression; and, that the damages to his wife resulted in extreme nervousness, headaches, nausea, indigestion, loss of sleep, reduction in ability to work, extreme fatigue and weariness, numbness of shoulders, aching and trembling of the throat and hands, crying and choking spells (feeling that she was burning up), hypertension, and chronic depression.

The case was tried before a jury. Appellant, Signature Indorsement Company, was found to have made unreasonable collection contacts upon appellee Wilson and his wife, Frances Wilson, possibly causing mental or emotional pain and physical illness, and that they acted with malice toward appellee and his wife. The jury found that appellants had charged appellee for insurance premiums and endorsement fees for the purpose of obtaining additional compensation for the use of the money. The jury awarded to appellee $500 as actual damages, and to his wife, Frances Wilson, $2,000 as actual damages. The jury denied Wilson any exemplary damages, but awarded his wife, Frances Wilson, $5,000 exemplary damages for malice and reckless disregard by their unreasonable contacts perpetrated by appellants upon Mrs. Wilson. The trial court deducted $810.00, the amount of the settlement, from the actual damages awarded to Wilson and his wife, and granted a judgment against Signature Indorsement Company, and alter ego W.

Lee Moore, Jr., jointly and severally, for $110.60 for usury double damages, $1,690.00 actual damages, $5,000 as exemplary damages, and canceled the purported balance upon the last notes executed by Wilson to Signature Indorsement Company. Appellants have perfected their appeal, and bring forward 23 points of error.

■ By their point 1, appellants· say the trial court erred in submitting to the jury, over timely objection, special issues Nos. 11 and 15, inquiring about unreasonable collection efforts, for the reason that said special issues submitted in global form an issue of ordinary negligence without separating and inquiring about the several particular elements that allegedly constituted the unreasonable (i. e. negligent) collection efforts pleaded by appellee.

By their point 2, appellant says the trial court erred in not submitting to the jury, over timely objection, special issues Nos. 12 and 16 inquiring about conduct and reckless disregard for the health and welfare of the appellant Wilson and his wife for the reason that the issues were a global submission of the issue of reckless disregard, and such issue should be submitted by referring to a particular fact which appellee claims was established by the evidence, by then inquiring whether such fact actually occurred, and by next inquiring whether such act or omission was actually done in reckless disregard. These points were passed on in Employee Finance Company v. Lathram (Tex.Civ.App.), 363 S.W.2d 899, 901 (affirmed in part and reversed and dismissed in part, Tex., 369 S.W.2d 927), in the following language:

"In point three appellants attack the issues on unreasonable collection efforts as being in global form.

"The plaintiff pleaded and proved that all the appellants were guilty of unreasonable collection efforts. Separate issues were submitted as to each defendant concerning the question of unreasonable collection efforts. Under the record, as presented to us, we think there was no error in failing to ask the jury if each defendant committed each act of the multitude of acts in evidence. The issues as presented were, from the nature of this case, ultimate issues."

Any opinion that we would write to the contrary would conflict with this opinion. The Supreme Court granted a writ of error, Employees Finance Company v. Lathram, 369 S.W.2d 927, and had this to say:

"* * * The only points of error presented complain of the action of the trial court *in striking allegations of contributory negligence* from petitioners' answer to respondent's claim for damages for unreasonable collection efforts, and of errors committed in the submission to the jury of *special issues and an instruction relating to respondent's claim for damages* resulting from unreasonable collection efforts. For purposes of this opinion, *WE MAY ASSUME, WITHOUT DECIDING,* that the points of error are good and should be sustained." (Emphasis added.)

It will be noted that the Supreme Court only assumed, but did not decide that the global submission of the issues constituted error. The points are overruled.

■ By their points 3 through 10, appellants say there is no evidence; there is insufficient evidence, and the findings of the jury with respect to malice is against the great weight and preponderance of the evidence; there is no evidence to support the finding of $5,000.00 exemplary damages to Mrs. Wilson, and the exemplary damages are excessive; there is no evidence and there is insufficient evidence to support the finding against appellant, Signature Indorsement Company, for acting in reckless disregard for the health and welfare of Mrs. Wilson, and such findings are against the great weight and preponderance of the evidence; there is no evidence, and there is

insufficient evidence to support the jury's finding of unreasonable collection efforts, and such findings are against the great weight and preponderance of the evidence.

According to the evidence, the appellants started calling Wilson on the telephone while he was on his job, about the middle of 1958, and continued the calls until about the middle of 1959. The calls would usually go to his employer, or to his foreman. If they went to the employer, the employer would buzz the foreman, and the foreman would tell Wilson about the phone call. Wilson asked the loan company not to call him on the job, but they continued to do so. These facts were verified by the employer and the foreman. There is testimony that Wilson received more telephone calls than all of the rest of the men combined, and estimated an average of 4 to 6 calls per week. He was warned by his foreman that the calls had to stop or he would lose his job. There were at least 3 or 4 calls to Wilson in a single day. The callers would use a harsh voice, talk loud, and rough, and demand that Wilson come to their office. There is evidence that Wilson became extremely nervous, suffered with serious headaches, lost about 15 lbs. in weight, could not eat nor rest or sleep at night, and the next morning he would be nervous, tired and give-out. He was working on a "piece work" basis, and because of the way he was harassed on the telephone, he could not turn out as many pieces of work as his fellow employees would turn out.

As to Mrs. Wilson, the evidence shows appellants would place telephone calls to her at her place of employment that would cause her to be embarrassed, nervous, she would suffer headaches, her shoulders would get numb, her hands would tremble, she would suffer from indigestion, her heart would hurt, she would be unable to breathe good, she would choke, and feel like she could not swallow, she continuously stayed in that state, it made her sick to go to work; and when the elevator would stop on her floor she would want to turn around and go home. Other employees testified about this condition, that they observed by her actions that she was nervous, white around the mouth, she would be so upset she could hardly work, one could just see her shake, her mouth would tremble, and her hands would, also. When she reached home at night she would be irritable and cross, and she would walk the yards, and could not sleep. On one occasion, she called the appellants from her mother's home, and her mother finally took the telephone and told them that Mrs. Wilson had a small baby and was having a hard time, and told them that if they did not quit calling her on the job that she was going to get fired. The employee said: "By Hell, I want my money," and told her that she was not a lady. On two occasions two men went to see her while she was on her job. On one occasion she got so upset that she almost "socked" one of them. This was witnessed by the employees, and one of the employees testified that she told the man to leave before he caused Mrs. Wilson to have a nervous breakdown. She testified that Mrs. Wilson was extremely nervous, was shrilling at the man, and that she was just unreal and was just beside herself. The man refused to leave immediately, and told Mrs. Wilson and the employees in a loud tone of voice that Mrs. Wilson was trying to beat the Company. He further told them that he was coming back. Mrs. Guthrie testified that after the man left, Mrs. Wilson was extremely nervous, upset, and shaky, her voice was still shrill, she was shaking all over, jerking, she had a tremor, she was just beside herself, was nauseated, and sick at her stomach. She further testified that she had never seen Mrs. Wilson so upset in her life. According to the evidence, the harassment and contacts caused Mrs. Wilson to take Rolaids, Bisodol, Tums, Asperins, Anacin, Milk of Magnesia, Pepto Bismol, and she did not know whether or not that was all. She took the medicine to try to get relief from indigestion, headache, and sick stomach. Many of the girls at the factory where she worked gave her a lot of medi-

cine, but she spent around $12.00 of her own. She was employed working at Jennifer Jones on a per piece basis, and because of the contacts of harassment she had a lot of repair to do. She was engaged in making dresses, and she would have to sit and rip and re-sew, and she could not sew a straight seam because of the contacts.

That seems to be enough evidence, and the evidence seems sufficient to support the jury's findings. But we will discuss the unreasonableness and reckless disregard on the part of the appellants. Remember that appellant Wilson actually received $45.16. He had already paid back $100.46. By the renewals of the notes that he had executed he had promised to pay back a total sum of $239.80. How could anyone put forth an effort to collect a usurious, void, illegal, and unconstitutional note or debt in such cases and the effort be reasonable? Wilson was not an educated man, and apparently he was easily sold as to the loans. Appellants knew that what they were doing was wrong. Such has been the law throughout the ages, and was announced as such in Cotton v. Cooper (Comm. of App.), Opt. adpt. and entered as a judgment of the Sp.Ct., 209 S.W. 135, in the following language:

"* * *, although the defendants were aware of such rule at the time, and were also aware that at such time he was not indebted to them in any sum, they nevertheless wrongfully, willfully, and maliciously, with wanton disregard of the rights of the plaintiff, and for the purpose of procuring his discharge, filed copies of said assignments, together with notice thereof with the said railway company * * *".

The evidence shows that appellant Cotton owned several loan companies in many southern states, apparently only where ignorant Negro labor was in abundance. Appellant Cotton and his employees would advise the needy and helpless that they could always get money from one of Cotton's institutions. They would charge the ignorant white people 20% interest per month, and the ignorant Negro people 30% interest per month. In the case we are now discussing, all of the charges made by appellants against appellee Wilson amounted to 1530% interest per annum. Speaking of the collection efforts, the court, in Cotton v. Cooper, supra, had this to say:

"Defendant cannot be heard to say that usury is a matter of defense or offset and could be waived; that, therefore, he could not be charged with knowledge that plaintiff would insist upon usury as a defense or as an offset."

In defining the loan companies, the court said:

"To the facts hereinabove set out, a part of the statement of the facts by the Court of Civil Appeals, might be added others from the record revealing the *nefarious character of the business of the 'loan offices.'* We will not particularize or set out such additional facts. The record discloses that the 'loan offices' controlled by defendant are conducted *in utter disregard of private rights and the public good,* and that the system has *fastened itself upon many hundred employés of various industries. In the city of Houston alone between 1,000 and 1,500 railroad employés are on defendant's books.* In the great majority of instances *the borrowers are from the very ignorant class.* Usurious transactions of the *most extreme and aggravating type* are cloaked and *concealed by subterfuge* in order to evade the penalties of the law. The powers of attorney executed by those dealing with defendant are as chains binding them to the system. *The threat of the filing of these instruments and the consequent loss of employment is kept ever before them, driving them through fear into deeper slavery.* In a word, *the business is*

*fraught with great evil,* not only to the individual, but to the public as well." (Emphasis added).

Chief Justice Hickman in Duty v. General Finance Company, 154 Tex. 16, 273 S.W.2d 64, 66, had this to say:

"We have been furnished by a representative of the Retail Merchants' Association of Texas with an argument of amicus curiae in reply to the application for writ of error, in which the fear is expressed that a holding that a cause of action has been stated in this case would hamper the department stores, national banks and ethical professional men in the collection of obligations owing to them. *The fear is not well founded. No such business concerns or ethical professional men will ever be guilty of such outrageous conduct as that described in the petition in this case. * * *"* (Emphasis added.)

There is lots of evidence, and the evidence is sufficient to support the jury's findings. Duty v. General Finance Company, supra; Wright v. E–Z Finance Co. (Tex.Civ.App.), 267 S.W.2d 602, er. ref., n. r. e.; Kimberly v. Howland, 143 N.C. 398, 55 S.E. 778, 7 L.R.A.,N.S., 545. Points Nos. 11 through 20 are overruled.

■ By their point 21, appellants say the trial court erred in dismissing their cross-action against McCarty Finance Service, Inc., and Quick Loan Service of Big Springs, because they were entitled to contribution from said cross-defendants under Art. 2212, Vernon's Ann.Rev.Civ.St.; and the dismissal of such cross-action burdens appellants with the necessity of a multiplicity of suits and security of action in order to establish its right of contribution. If the appellants had been diligent, the point would be well taken. The suit was filed on Sept. 24, 1959. The settlement was made with the cross-defendants on March 21, 1962. Appellants did not file their cross-action until shortly before the case was called for trial. Neither of the cross-defendants were served with any process or citation whatever, and McCarty Finance Service, Inc., never filed an answer. Quick Loan Service filed an answer on the date the trial commenced. The trial court dismissed the cross-action because of the appellants' failure to act with reasonable promptness in bringing in third parties. The Supreme Court of Texas has held that where two or more wrongdoers join to produce an injury, all of the wrongdoers are jointly and severally liable to the persons wronged for the entire damages suffered. It has further held that if less than all the tort feasors are joined as defendants by plaintiff, then those joined may bring in the others. Riley v. Industrial Finance, 157 Tex. 306, 302 S.W.2d 652; Landers v. East Texas Salt Water Disposal Company, 151 Tex. 251, 248 S.W.2d 731. The holding of the Supreme Court does not make it mandatory that a defendant can wait until the date of the trial and then bring in the joint tortfeasors, and, thereby, force another continuance. Art. 2212 V.R.C.S. clearly provides for the right of contribution among joint tortfeasors as among themselves, Lottman v. Cuilla, (Tex.Comm. of App.), 288 S.W. 123. The appellants would not be entitled to a continuance nearly five years after the suit was filed merely to make the joint tort feasors parties to the suit. Schubert v. First Nat. Bank of Raymondville (Tex.Civ.App.), 40 S.W.2d 240, N.W.H.; Ratliff v. Russek (Tex.Civ.App.), 59 S.W.2d 859, er. ref. The point is overruled.

■ Appellants failed to brief their point of error No. 22, and the error that the trial court may have committed has been waived. Rule 418, Texas Rules of Civil Procedure; Garcia v. Lacey (Tex.Civ. App.), 316 S.W.2d 183, N.W.H.; Stanford v. Brooks (Ct.Civ.App.), 298 S.W.2d 268, N.W.H. The point is overruled.

By their point 23, appellants take the position that there is insufficient evidence to support the jury finding that the endorse-

ment fees charged to appellee were interest, and such findings were against the great weight and preponderance of the evidence. We have examined the statement of facts. We hold that the evidence is sufficient to support the jury's findings. The point is overruled.

The judgment of the trial court is affirmed.