**CREDIT PLAN CORPORATION OF HOUSTON et al., Appellants,**

v.

**John B. GENTRY et ux., Appellees.**

No. 1011.

Court of Civil Appeals of Texas, Houston (14th Dist.).

Nov. 6, 1974.

Rehearing Denied Nov. 27, 1974.

D. R. Bernard; Bernard & Bernard, Houston, for appellants.

Edwin H. Momberger, Houston, for appellees.

TUNKS, Chief Justice.

This is an unreasonable collection efforts case. Appellants, Credit Plan Corporation of Houston, Colonial Finance Corporation, Kelcor Corporation, and Joe Assad, appeal from the trial court's judgment on a jury verdict awarding appellees, John and Eileen Gentry, $69,747.35 actual and $69,447.-35 punitive damages.

In 1968, the Gentrys borrowed money from Credit Plan Corporation of Houston (hereinafter referred to as Credit Plan). They were behind in their payments for November and December, 1968, and for January, 1969. During January, the Gentrys started receiving telephone calls from Credit Plan employees concerning their delinquency in making payments. During February, 1969, the calls become more frequent, and at least one call was made to John Gentry's employer. On the evening of February 7, 1969, Joe Assad, an assistant collection manager of Credit Plan, acting within the scope of his employment, called at the Gentry home in person. An argument ensued between the Gentrys and Assad. Shortly after Assad left, John Gentry suffered a coronary occlusion and was admitted to the hospital. He remained there until April 1, 1969, and was readmitted for treatment for precardial pain during several weeks in July, 1969. During Gentry's first hospitalization, his family continued to receive telephone calls from employees of Credit Plan. The Gentrys' debt to Credit Plan of some $158.00 has since been paid by proceeds from an insurance policy taken out as a requirement for the loan.

The Gentrys timely filed a petition for damages arising out of these collections efforts against Credit Plan, Assad, and C. V. Blankenship, who had made most of the telephone calls. On May 17, 1972, over three years after the events occurred from which their cause of action arose, the Gentrys filed a second amended petition naming as defendants Credit Plan, Assad, and Blankenship, and adding Colonial Finance Corporation (Colonial) and three individuals, who were officers, stockholders, and directors of both Colonial and Credit Plan. The petition stated that Credit Plan was actually the alter ego of Colonial, and allegations were made to support this contention. Thereafter, on February 7, 1973, the Gentrys filed a third amended petition, naming as defendants Credit Plan, Colonial, and Assad, and adding as a defendant Kelcor Corporation (Kelcor). It was alleged that Kelcor was incorporated on May 12, 1969, as a holding company, and that all of Colonial's assets were transferred to Kelcor in an attempt to further insulate Credit Plan from liability in the Gentrys' cause of action. Facts were alleged in the petition to show that Credit Plan was the mere alter ego of Colonial and Kelcor and completely under their control.

On May 18, 1973, Colonial and Kelcor filed a motion for summary judgment, basing their motion in part on the two-year statute of limitations. Vernon's Tex.Rev. Civ.Stat.Ann. art. 5526 (1958). This motion was overruled. Discovery continued and the case was tried before a jury in October 1973. Under Texas Rules of Civil Procedure, rule 174(b), the court ordered separate trials of the two main issues in the case. The jury first heard evidence and answered special issues pertaining to the Gentrys' tort action, and then the issue of whether Credit Plan was the alter ego of Colonial and Kelcor was tried.

The jury found that Credit Plan's collection efforts during the period of February 1, 1969, through April 15, 1969, were unreasonable, that they were the proximate cause of any physical illness, or physical or emotional pain suffered by John Gentry, that they were the cause of any illness or emotional pain suffered by Eileen Gentry, and that John Gentry did not provoke the altercation between himself and Assad on February 7, 1969. The jury awarded John Gentry $10,000 for past and future pain and mental anguish, $39,750 for past and future loss of earnings, and $9,497.35 for past and future medical expenses. Eileen Gentry was awarded $10,000 for past and future mental anguish and $500 for loss of consortium. The jury further found that Credit Plan's collection efforts were carried out with malice toward the Gentrys, and an award of $69,447.35 punitive damages was made. By their answers to supplemental issues, the jury found that at all times material to the cause of action, both Colonial and Kelcor exercised com-

plete control over Credit Plan to the extent that the three corporations had the same owners, the same officers, and the same assets.

Appellants made motions for instructed verdict, to disregard the jury findings, and for judgment n. o. v., all of which were overruled. On November 19, 1973, the trial court entered judgment on the verdict for the Gentrys, and the appellants' motion for a new trial was subsequently overruled. All the appellants have perfected an appeal.

Numerous points of errors are assigned on this appeal, but most of them may be discussed under several major issues.

## I. STATUTE OF LIMITATIONS

■ Appellants Kelcor and Colonial argue that any claim for personal injuries against them arising out of events in February through April, 1969, is barred by the two-year statute of limitations. Tex.Rev. Civ.Stat.Ann. art. 5526 (1958). We agree. Appellees contend that because Credit Plan was the alter ego of Kelcor and Colonial, service on Credit Plan constituted notice to the other two corporations. However, the cases relied on by appellees presented the situation either of misnomer of a defendant who had been timely served with citation and answered, or of change in the capacity in which the defendant was sued. *See e. g.,* Hallaway v. Thompson, 148 Tex. 471, 226 S.W.2d 816 (1950); Callan v. Bartlett Electric Cooperative, 423 S.W.2d 149 (Tex.Civ.App.—Austin 1968, writ ref'd n. r. e.); National Transfer & Rigging Co. v. Clark, 249 S.W.2d 630 (Tex.Civ.App.— Galveston 1952, writ ref'd n. r. e.).

■■ Where one sues an existing entity, the filing of such suit will not ordinarily toll the running of limitations as to the claim against another existing entity. Lunsford v. Sage, Inc. of Dallas, 438 S. W.2d 615 (Tex.Civ.App.—Houston 1st Dist. 1969, writ ref'd n. r. e.); Krenek v. Epps Super Market No. 2, Inc., 377 S.W.

2d 753 (Tex.Civ.App.—Austin 1964, no writ); West v. Johnson, 129 S.W.2d 811 (Tex.Civ.App.—Fort Worth 1939, writ ref'd). The existence of the defendants originally sued by these plaintiffs and of the later joined defendants, Kelcor and Colonial, is not questioned. The fact that the two later defendants were using their wholly owned subsidiary, Credit Plan, as their alter ego and agent in accomplishing their own purpose is immaterial. A plaintiff does not, by suing an agent or employee, thereby toll the running of limitations as to the plaintiff's claim against the defendant's principal or employer. Therefore, Article 5526 is a bar to the appellees' cause of action against appellants Colonial Finance Corporation and Kelcor Corporation, and the trial court's judgment against them is reversed and judgment is rendered in their favor.

## II. UNREASONABLE COLLECTION EFFORTS

■ Appellants assign as error the submission to the jury of certain issues and the trial court's refusal to submit other issues requested by appellants. However, the record filed in this Court within the sixty-day time limit fails to show that appellants preserved these points of error by making proper objections in writing to the trial court before the case was submitted to the jury. Under Tex.R.Civ.P. 272, these points were waived and may not be passed upon on appeal. Cody v. Mahone, 497 S.W. 2d 382 (Tex.Civ.App.—San Antonio 1973, writ ref'd n. r. e.); Carter v. Walton, 469 S.W.2d 462, 472–473 (Tex.Civ.App.—Corpus Christi 1971, writ ref'd n. r. e.).

Appellants, by their points of error 9 through 11, contend that the jury finding that Credit Plan and its employees used unreasonable collection efforts against the Gentrys is against the legal and factual sufficiency and great weight and preponderance of the evidence.

■ First, we must look only to the evidence and reasonable inferences therefrom

in support of the verdict to see if there was any evidence from which a reasonable jury could conclude that Credit Plan committed acts constituting unreasonable collection efforts against the Gentrys. At the trial, Eileen Gentry testified that she told a Credit Plan employee in December 1968, or January 1969, that the reason they were late in making payments was because she had been ill and unable to continue her work as a nurse, but that she was returning to work in early January. She testified that during January, a Mr. Blankenship from Credit Plan began calling her every day, which disrupted her sleep since she was working at night. She said that at least once, she received a telephone message at work that Mr. Blankenship called. John Gentry testified that his wife had explained why they were delinquent in payments to Credit Plan employees on numerous occasions.

On February 7, 1969, Gentry stated that he had a message to call a Mr. Ayers at Credit Plan. He tried to return the call twice, but each time a secretary put him on "hold" for several minutes, so he hung up since he did not want to tie up his company's lines. Gentry testified that shortly after he arrived at home that evening, Joe Assad came to see him. He said Assad was a large man with a scowling face and a heavy voice. Gentry said that immediately upon entering, Assad asked him why he had not returned their call. Gentry tried to explain, but Assad called him a "damn liar," and said Gentry hadn't tried to return the call. Gentry testified that Assad stood over him shouting and shaking his finger at him, and told him he was a "liar" and a "damn deadbeat." Gentry said he would come to Credit Plan's office the next day and talk to Mr. Ayres (whom the Gentrys had dealt with previously), but Assad said he (Assad) was now in charge of the Gentrys' account and was going to settle it right then and there. Gentry asked him to leave and threatened to call the police but Assad said he was not leaving until he settled their account. Gentry's eighteen year old son Greg came into the room, and Assad turned on him, asking him what kind of a man his father was. Eileen Gentry came in the room and Assad began questioning her in the same manner. At this point, Gentry called the police, and they said they would send someone over. Assad continued to berate Gentry's wife and son and asked to use their phone so he could call for a truck to come pick up their furniture, referring to it as "junk." Assad left, saying he was coming back with a truck for the furniture. (Gentry called the police back and told them that the bill collector had left, so they never came.)

Eileen Gentry testified that during this incident she was in the kitchen, but she became alarmed when she heard loud voices in the living room. She saw Assad standing over Gentry berating him, so she asked her son Greg to go help him. She said that the younger children were in the next room crying and were very upset. Greg Gentry testified in a similar manner, and also estimated that Assad was in the Gentry home 45 minutes to an hour. Joe Assad testified that while he was in the Gentry home he asked to use their phone to call his office. Assad's admission of March 14, 1973, was offered into evidence to show that he admitted demanding possession of the Gentry's furniture and fixtures during his call at their home on February 7.

After Gentry's heart attack and hospitalization that same night, the phone calls continued. Mrs. Gentry testified that Mr. Blankenship called her repeatedly and that she finally quit answering the phone. She stated that one time the phone rang continuously for two hours, and that when her daughter finally answered it there was no one on the line. Martha Gentry, a daughter who had returned home from college due to her father's illness, testified that she took a number of calls from Mr. Blankenship. She said that he asked for her mother and she tried to explain that she was resting, that she was exhausted from sitting with her father at the hospital. On

one occasion, Martha Gentry testified that Mr. Blankenship replied: "God damn, you wake up Mrs. Gentry. I don't want to talk to some idiot kid." She hung up and he continued to call her back for one hour. Every time she would answer the phone, he would hang up. During these telephone conversations with Martha Gentry, Mr. Blankenship referred to the Gentrys as "irresponsible people," and a "bunch of bums."

Reviewing the evidence which supports the trial court's finding that Credit Plan and its employees engaged in unreasonable collection efforts against the Gentrys, we cannot say that there is no evidence or insufficient evidence to support that finding. Nor does a survey of the evidence which contradicts the jury's finding show that it is contrary to the great weight and preponderance of the evidence.

Joe Assad testified that his purpose in visiting the Gentrys on the evening of February 7, 1969, was to get Mr. Gentry to call the main office and set up an appointment for the purpose of making arrangements concerning loan payments. Assad stated that from the outset of his visit Gentry's attitude toward him was hostile and that he cursed him in an attempt to bait him or make him mad. He also described Gentry as indifferent and completely unresponsive to his questions and suggestions that he contact the main office concerning payments. He tried talking to Mrs. Gentry, who seemed amused at him and talked to him in a patronizing manner. Assad denied that he raised his voice, that Mr. Gentry asked him to leave, that he called any one a "deadbeat," or that he said he was not leaving until he got their payment or their furniture. He admitted asking to use the phone, but denied that he said he wanted to call a truck to come pick up the furniture; he said he wanted to call the office. He denied using profanity or referring to their furniture as "junk" or "crap." He said he was only at the Gentry's home for thirty minutes or less.

Credit Plan's card concerning the Gentry's loan, which was kept as a business record, was offered into evidence. It showed that only five or six calls were made to the Gentrys after February 7, 1969. Assad testified that it was a company rule to document all calls that are made. He said that in doing this kind of follow up work, he had a large number of calls to make at one time and could spend no more than five minutes on any one call. Therefore, it would have been impossible for him to have tried to get someone on the telephone continuously for two hours. Mr. Edwin Davion, who became Credit Plan's collection manager since the period in question, testified that all telephone and house contacts are documented on the cards.

All the foregoing evidence was for the jury to weigh, taking into consideration the credibility of the witnesses they observed at the trial. On the record before this Court, we cannot say that the evidence required a different finding on the issue of unreasonable collection efforts than that which the jury made. Many of the elements present in this case were also present in other cases where the courts found that unreasonable collection efforts were carried out. Frequent phone calls at all hours, use of harsh and abusive language, demand for collateral immediately upon borrower's default, and calls to borrower's employer and family are some of the elements found to constitute unreasonable collection efforts in the following cases: Duty v. General Finance Company, 154 Tex. 16, 273 S.W.2d 64 (1954); Bank of North America v. Bell, 493 S.W.2d 633 (Tex.Civ.App.—Houston [14th Dist.] 1973, no writ); United Finance & Thrift Corp. of Mesquite v. Bain, 393 S.W.2d 429 (Tex.Civ.App.—Tyler 1965, writ ref'd n. r. e.); Signature Indorsement Company v. Wilson, 392 S.W.2d 484 (Tex.Civ.App.— Texarkana 1965, writ ref'd n. r. e.); Moore v. Savage, 359 S.W.2d 95 (Tex. Civ.App.—Waco), writ ref'd n. r. e. per curiam, 362 S.W.2d 298 (Tex.1962);

Houston-American Life Insurance Co. v. Tate, 358 S.W.2d 645 (Tex.Civ.App.— Waco 1962, no writ).

Points of error 9 through 11 are overruled.

## III. PROXIMATE CAUSE

■ By their points of error 13 through 16, appellants attack the jury's finding that their unreasonable collection efforts were the proximate cause of John Gentry's illness. Appellants contend that there is no evidence or insufficient evidence that his heart attack was a natural, probable and foreseeable result of any acts or omissions of the appellants, and that the jury's finding in this regard is against the great weight of the evidence.

At the trial, Eileen and Greg Gentry both testified that John Gentry became visibly ill during his altercation with Assad on February 7. Greg Gentry noticed that his father was gray and trembling, "shaking violently," "dazed and confused," and "could not stand very well by himself." Eileen Gentry testified that when she came into the living room where Assad and Gentry were arguing, her husband was " . . . shaking, ashen colored and having a problem breathing." She said his voice was "cracking and shaking." Mrs. Gentry stated that after Assad left, she suggested that her husband lie down while she finished fixing dinner. Around 8:30 P.M. he was gasping for breath, shaking and perspiring, and she could hardly get his pulse. She called their doctor, and Gentry was taken to the hospital by ambulance and admitted at 9:05 P.M.

John Gentry testified that after Assad left, he felt " . . . stunned. . . . My throat felt paralyzed, was tight, I couldn't talk. It felt like somebody hit me in the stomach, I was sick at my stomach, and felt so weak." He then called Credit Plan's office and made an appointment to see Mr. Ayers the next day. After that,

he was unable to remember anything else that happened that night.

Dr. Albert Dashiell, who treated Gentry during his hospital confinement, testified as follows: "There is no shadow of a doubt this was an acute onset. . . . There's no doubt but what he had an acute episode on the night of February 7th. Every bit of the evidence indicates that." Dr. Dashiell, in answering appellees' counsel's hypothetical question as to whether a series of events such as those alleged to have occurred February 7 could cause a heart attack, stated:

It is my opinion that fright, anger or excitement can precipitate a coronary occlusion in a person who has the prerequisite changing in his coronary arteries. . . . I would say that would be sufficient in a person with coronary artery disease to precipitate an attack.

He also said that a lay man should be able to observe that a person with such a condition is ill.

Again Dr. Dashiell was asked: "In the case of Mr. Gentry did it or did it not, in your medical opinion, precipitate this attack, this condition which you treated on February 7th?" He answered: "Yes, I would say that would be sufficient in a person with coronary artery disease to precipitate an attack. It is like shouting 'Fire' in a theater, you will have two or three people to have a coronary occlusion."

Such evidence was legally and factually sufficient to support the jury's conclusion that the conduct of the defendants was the cause of Gentry's heart attack. Such a finding by the jury was not against the preponderance of the evidence. Lenger v. Physician's General Hospital, Inc., 455 S. W.2d 703 (Tex.Sup.1970); Insurance Company of North America v. Kneten, 440 S.W.2d 52 (Tex.Sup.1969).

Dr. Dashiell testified that Gentry was hospitalized from February 7 to March 15, 1969, for the acute attack. He was readmitted a few days later for an apparent

gall bladder flareup and was discharged April 1. In response to a question from appellants' counsel, he stated:

We gave up on the gall bladder pretty quick when the second x-rays showed a normal gall bladder. We would not have kept him that long, we were trying to rehabilitate him, get him back on his feet so he could resume activity. He hadn't succeeded in the first hospitalization.

Q: This period had to do with heart rehabilitation?

A: Yes.

Dr. Dashiell also testified that Gentry was hospitalized several weeks in July 1969, ". . . to attempt to find some method by which we could make him a more efficiently functioning man." This confinement was also connected with the heart attack suffered February 7.

Appellants attempted to show that Gentry's underlying arteriosclerosis was the proximate cause of his heart attack. Gentry testified that in 1961, he had been in the hospital for tests to determine the presence of heart disease, but these tests were inconclusive. He stated that he was given nitroglycerin to take for chest pains, but that the symptoms disappeared and he quit taking the nitroglycerin altogether shortly thereafter. Prior to February 1969, this was the only time he saw a doctor for heart trouble. Appellants offered in evidence the hospital records of February 7, 1969, wherein it was stated that Gentry had taken nitroglycerin that day. However, Dr. Dashiell did not remember accurately what he was told. He stated that Gentry was in shock and heavily sedated, and was therefore unable to tell him much of anything. John Gentry testified that he took no nitroglycerin during the week leading up to February 7, nor on the evening he suffered the attack. Eileen Gentry corroborated this testimony and denied making any statement to the contrary to Dr. Dashiell.

Appellants argued at the trial that Dr. Dashiell's treatment of Gentry up to the fourteenth to twenty-first day after the heart attack was to repair the damage done by the acute attack on February 7; but that treatment subsequent to the formation of scar tissue was for his pre-existing artery disease, which appellants' alleged unreasonable collection efforts had not caused. But Dr. Dashiell testified that his ". . . treatment was for his heart function to permit him to function as much and as fully as we could *with the limitations put upon him by the heart attack*." (emphasis supplied) He stated that as a result of the attack, his heart was not capable of meeting the stress that it was able to before February 7. There was much testimony that Gentry led a normal, active life prior to February 7, 1969, and that since his heart attack, he has been unable to work and has become a semi-invalid. Therefore, we hold that the evidence clearly supports the jury finding the Credit Plan's unreasonable collection efforts were the proximate cause of John Gentry's illness. Furthermore, it is reasonably foreseeable that a campaign of harassment carried out in order to collect a debt is likely to cause the debtor great anxiety and mental stress, which often causes or contributes to physical pain and illness. The cases have upheld damage awards based on a decline in health following unreasonable collection efforts. *See* Signature Indorsement Company v. Wilson, *supra* 392 S.W.2d at 488–489; Moore v. Savage, *supra* 359 S.W.2d at 96; Houston-American Life Insurance Co. v. Tate, *supra* 358 S.W.2d at 650. The evidence clearly shows that the medical bills about which the doctor testified and Gentry's declining health were the result of the heart attack Gentry suffered February 7, which was in turn caused by the appellants' conduct.

Appellants' points of error 13 through 16 are overruled.

By point of error 17 appellants assert that there was no evidence to support the jury's finding that Eileen Gentry's mental and emotional suffering was proximately caused by Credit Plan's unreasonable collection efforts.

Eileen Gentry testified that she had had major surgery during the summer of 1968 and was unable to recover sufficiently to return to her job as a nurse during the rest of the year. In early January she took a job as a night nurse, and notified Credit Plan that she was returning to work. During this month a Mr. Blankenship from Credit Plan started calling her while she was sleeping during the day, and these calls continued on a regular, almost daily basis up to February 7. At least one time, he called her place of employment. After February 7, she received numerous calls at home. She said:

I was to the point I wouldn't answer the phone. I was upset, every time it rang it upset me violently. The children answered the phone, which I instructed them not to, but they would want to speak to me and would identify himself as Mr. Blankenship. This was a continuing thing.

In describing her relationship with her husband, Eileen Gentry testified as follows:

We had a good relationship. Now we sleep in separate beds. I am concerned, if I hear him taking a deep breath I get out of my bed to see if he is in trouble. Every one lives with death, but not that you think someone will be dead the next hour or so. It's always on your mind, no one to talk to about it, you keep it to yourself.

Martha Gentry also testified that she had spoken with Mr. Blankenship on the telephone during this period of time. She had told him that her mother was physically and mentally exhausted from sitting with her father at the hospital, but he kept insisting that she put her mother on the phone. In describing her mother's condition at this time, Martha Gentry said:

She was under a bad strain. I was worried about her. It hadn't been many months before that I left her, she had major surgery, had just recently returned to work. . . . [She had]

mental or physical exhaustion and she couldn't think. I actually had to take over as best I could.

We hold that there is evidence from which a jury could reasonably find that Credit Plan's collection efforts were the proximate cause of Eileen Gentry's mental or emotional pain and suffering and that such suffering was reasonably foreseeable. Point of error 17 is overruled.

## IV. DAMAGES

By their points of error 22–24, appellants argue that the jury erred in awarding $5000 to John Gentry for future pain and suffering because his heart attack was over on the fourteenth to twenty-first day and any remaining pain or disability was attributable solely to his pre-existing artery disease. We have discussed this point thoroughly on the issue of proximate cause and find it to be without merit. These points of error must, therefore, be overruled.

By points of error 25 through 30, appellants contend that the jury erred in awarding John Gentry $27,500 for loss of earnings in the past and $12,250 for loss of earning capacity in the future. Gentry testified that in 1968 and 1969 he was employed as a construction estimator, and at the time of his heart attack he was earning $5.00 an hour plus $12.00 a day. Horace Brown, a co-worker during the period in question who had the same job description as Gentry had and who earned the same salary, testified that he is now earning $8.-90 an hour, which includes per diem. His W2 forms for 1969, 1970, 1971 and 1972 were offered into evidence. Dr. L. C. Wolken was qualified as an expert witness in the field of econometrics and testified as to Gentry's future earnings. Appellants argue that it was error to admit this testimony into evidence over their objection because it was too speculative and the future earnings were computed without regard to Gentry's physical condition. However, appellants' counsel questioned Dr. Wolken

twice on voir dire and brought out the weaknesses of the method he used and hypothetical nature of his figures. Dr. Wolken estimated that Gentry had lost $48,800 past and $227,553 future earnings based on retirement at age sixty-five. The jury awarded Gentry only $27,500 past and $12,250 future earnings.

From the evidence of Gentry's health and work record prior to his heart attack and the evidence of his total inability to work since then, we find the jury's award for past and future loss of earnings to be a quite conservative figure and amply supported in the record. Points of error 25 through 30 are overruled.

By points of error 35 through 40, appellants argue that the finding of $4,847.35 past and $4,650 future medical expenses is unsupported by the evidence or is contrary to the greater weight of the evidence.

Regarding past expenses, the hospital bills, pharmacy bills, and doctor bills were all offered into evidence. Dr. Albert Dashiell testified that his fee was reasonable for the same or similar services rendered in Houston, Texas, and that they related solely to treatment for his condition dating from February 7, 1969. He also testified that the drugs Gentry was taking were reasonable and necessary and that each hospitalization was necessary. Alfred Renfro, credit manager and custodian of financial records at the hospital, testified that he was familiar with hospital charges in Houston and that in his opinion Gentry's bill was reasonable for this area.

Regarding future medical expenses, Dr. Dashiell testified that Gentry's condition probably is permanent and that he will probably incur future expenses. He testified as to his own fees and the current cost of various medical services. Dr. Wolken also testified concerning the increase in medical costs in the Houston area and gave an estimate of Gentry's future medical expenses.

We hold that the jury's finding of $4,847.35 past and $4650 future medical expenses is supported by the evidence. Appellants' points of error 35 through 40 are overruled.

■ By points of error 32 through 34, appellants argue that the jury's award to Eileen Gentry of $5000 past and $5000 future mental anguish is unsupported by the evidence and is contrary to the greater weight of the evidence.

■ Appellants contend that where there is no physical injury, a plaintiff may not recover for mental suffering alone in a cause of action based on negligence. However, where there is a finding of malice or an action constituting wilful and wanton disregard of the plaintiff's well being, recovery for mental anguish alone which was proximately caused by the wrongdoing is allowed. Fisher v. Carrousel Motor Hotel, Inc., 424 S.W.2d 627 (Tex.Sup.1967); Harned v. E–Z Finance Co., 151 Tex. 641, 254 S.W.2d 81, 85 (Tex.Sup.1953); Laney v. Rush, 152 S.W. 2d 491, 493 (Tex.Civ.App.—Amarillo 1941, no writ). Here there was a jury finding of just such misconduct on the part of Credit Plan and its employees. We have already held that Eileen Gentry's mental suffering was proximately caused by this misconduct and that such suffering was foreseeable. Therefore, these points of error must also be overruled.

## V. EXEMPLARY DAMAGES

■ By their points of error 46 through 51, appellants contend that the jury erred in its finding that the unreasonable collection efforts were carried out with malice toward the Gentrys and that the award of $69,447.35 exemplary damages is unsupported by the evidence or is contrary to the greater weight of the evidence.

■ The purpose of awarding exemplary damages is to set an example which will deter the defendant and others similarly situated from engaging in such

wrongful conduct in the future. "Due regard should be given to the party's inconvenience, attorney's fees, mental anguish, sense of being wronged and insulted, and other losses too remote to be considered under actual damages." Bank of North America v. Bell, *supra* 493 S.W.2d at 636. Exemplary damages are peculiarly within the province of the jury.

The rule holding a principal liable in exemplary damages for the acts of his agent was set out in Fisher v. Carrousel Motor Hotel, Inc., *supra*. The principal will be liable if:

. . . (a) [he] authorized the doing and the manner of the act, or (b) the agent was unfit and the principal was reckless in employing him, or (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or (d) the employer or a manager of the employer ratified or approved the act. *Id*. 424 S.W.2d at 630.

There is evidence in the record from which the jury could find that Credit Plan either authorized or ratified a campaign of unreasonable collection efforts to be carried out by its agents Assad, Blankenship, and others against the Gentrys. The evidence also supports a finding that Assad and Blankenship were employed in a managerial capacity and were acting within the scope of their employment during their dealings with the Gentrys.

We hold that the evidence in this case clearly supports the finding that Credit Plan acted through its employees with malice toward the Gentrys. Many of the facts in this case are similar to facts found in other cases where a finding of malice on the part of the creditor was made. *See* Bank of North America v. Bell, *supra* 493 S.W.2d at 635; Signature Indorsement Company v. Wilson, *supra* 392 S.W.2d at 488; Houston-American Life Insurance Co. v. Tate, *supra* 358 S.W.2d at 649–651.

■ Appellants' final contention is that the award of $69,447.35 exemplary dam-

ages is not supported by the evidence or is contrary to the greater weight of the evidence because there is no evidence that this figure is reasonably proportioned to the actual damages. (There is no point of error complaining that the damages are excessive and that a remittitur should be ordered.) We have determined that the actual damages totalling $69,747.35 are proper. This award is on a one-to-one ratio with the award of exemplary damages, so we must overrule appellants' contention that there is no reasonable proportion between the two. Appellants' points of error 46 through 51 are overruled.

The judgment below as to appellants Colonial Finance Corporation and Kelcor Corporation is reversed and rendered, and it is ordered that appellees John and Eileen Gentry take nothing against them. The judgment against Credit Plan Corporation and Joe Assad is in all things affirmed.

Affirmed in part, and in part reversed and rendered.